MILTON J. DANIELS, Receiver, *vs.* H. H. PALMER, impleaded, etc.

June 25, 1889.

**Grain Warehouseman—Conversion — Remedies of Depositors.**—The remedies provided for by Laws 1876, *c.* 86, §§ 3, 4, (Gen. St. 1878, *c.* 124, §§ 15, 16,) a law regulating the storage of grain, are not exclusive, but are in addition to such as previously existed at common law or by statute in case of the conversion of personal property by a bailee.

**Same — Insolvency — Ticket-holders as Creditors.** — The holder of a wheat ticket or receipt issued by a warehouseman who has become insolvent is a creditor, within the spirit and meaning of the insolvency law. (Laws 1881, *c.* 148.)

Appeal by plaintiff from a judgment of the district court for Goodhue county, *McCluer*, J., presiding.

*Chas. C. Willson*, for appellant.

*W. C. Williston*, for respondent.

COLLINS, J.[1]　On May 24, 1884, the defendant Wells was indebted to various persons in a sum exceeding $79,000, and had also incurred a liability arising upon a large number of wheat "tickets" or receipts, issued by him as warehouseman, and calling for over 10,000 bushels of wheat, of the value of $7,603, at the then market price. Of these tickets enough to represent 1,000 bushels were owned by the other defendant, Palmer. Wells's assets, including wheat in store in his elevator, valued at $3,942, and for which a part of the aforesaid tickets had been issued, were of the estimated value of $33,942. The elevator building, including the tract of ground upon which it stood, valued at $7,000, and the proceeds of a sale, for $8,000, of some certificates of stock held by Wells, were the only available assets, the balance of his property being heavily incumbered. On the day mentioned Wells turned over to Palmer the wheat in store, in trust for those who held his wheat tickets; also by proper conveyance transferred to him his interest in two tracts of mortgaged land, and the title in fee to the elevator and the land upon.

[1] Gilfillan, C. J., being absent because of illness, took no part in this case.

which it stood,—all of which was worth $8,000. The only consideration for said conveyance was an agreement as follows: "I hereby agree to protect the receipts of the Wells elevator and Forest Mills wheat receipts to the extent of eight thousand dollars over and above what wheat there is now on hand in said elevator. May 24, 1884. H. H. PALMER." The receipts referred to in said writing as those of the Wells elevator were the above mentioned, while those styled "Forest Mills" receipts had been issued by a wholly worthless milling corporation, of which Wells was president, and in which he held a large block of stock. On the same day another agreement was made between Wells and Palmer, by which the $8,000, before referred to as derived from the sale of stock, was, on May 26th, placed to Palmer's credit in a Rochester bank, to be used by him in taking up and redeeming wheat tickets issued at the elevator and at the mills, but not provided for in the writing above quoted. Wells immediately left the state, and on June 21st following the plaintiff was duly appointed receiver of his property in proceedings instituted by virtue of section 2, *c.* 148, Laws 1881, (the insolvency act.) On October 24th, he commenced this action to have the conveyance and transfer to Palmer declared and adjudged void, under the provisions of section 4 of chapter 148, *supra.* Upon the issues made by the pleadings a trial was had, resulting in a judgment for the defendant. This court subsequently reversed said judgment, and granted a new trial. *Daniels* v. *Palmer*, 35 Minn. 347, (29 N. W. Rep. 162.)

As will be seen by examination, the questions now brought to our attention were not presented upon the first appeal. Upon the second trial but one issue was submitted to a jury, namely: "When Wm. S. Wells transferred and conveyed the real estate, property, and money to H. H. Palmer, in May, 1884, did Palmer have reasonable cause to believe that Wells was insolvent?" This was answered in the affirmative; whereupon the court made and filed findings covering other facts, and as a conclusion of law directed that judgment be entered for defendant. The plaintiff appeals from the judgment thereafter rendered.

The insolvency act has been before this court many times since its enactment in 1881, but there is now demanded of us a construc-

tion of some of its provisions in connection with a part of that other statute of this state (Gen. St. 1878, c. 124, §§ 13 et seq.) which regulates and controls the storage and transportation of grain, and which changed the rule of law in regard to the deposit and storage of grain, declaring that a bailment which had been previously, and almost uniformly, held a sale or *mutuum;* and which conferred upon the bailor or his representative, the holder of the ticket issued by the warehouseman, the right, if delivery is refused upon demand, to recover possession of a like quantity of grain and of the same grade as that deposited, notwithstanding its identity has been lost through intermingling with the grain of others, or it has wholly disappeared through removal or shipment. It may also be observed that if the action to recover possession is commenced in district court, it is to be conducted as if for claim and delivery. If prosecuted in justice's court, the manner of procedure is as if it were an action in replevin. The value of the grain may be awarded the plaintiff in either case, if the property sought is not obtained; that is, if the judgment cannot be satisfied out of grain in store in the warehouse.

The grain and warehouse law now under consideration has many anomalous features, the result, perhaps, of necessity. But the evils it strives to correct, and the practices it endeavors to remedy, are quite apparent. It must be construed with its purposes in mind, and with a view to fairly promote its objects. Unless otherwise provided in plain terms, its several sections must be considered in connection with other statutes,—the result, as is this, of the needs and demands of rapidly growing business interests. It certainly was not written in opposition to any part of the insolvency law. To say that the remedy prescribed is exclusive, because it is novel, or because it denominates that transaction a bailment which has heretofore been declared a sale, is perhaps to cripple and obstruct, and not to promote and advance, the interests of the very class of men it was designed to aid and assist. Although pronouncing the delivery of grain for storage a bailment, the statute yields to the imperative demands of the warehouse business by recognizing that the grain deposited must be intermingled, that additions are of daily occurrence, and shipments almost as frequent. It places the grain

in store beyond the reach of ordinary process against the bailee, and makes it his duty to respond in kind whenever demand is made, the tickets presented, and charges tendered. It further authorizes the commencement of an action having in view the ultimate seizure of grain, if it be upon hand; if not, a money judgment for its value; and, should the warehouseman wilfully neglect or refuse to comply with the demand, he may be adjudged guilty and punished as for the crime of larceny. By this law the relations of the parties to a transaction of this character are radically changed, and with these new rights are furnished new remedies. But no sound reason can be advanced for holding that because the wilful neglect or refusal before mentioned is declared a crime, or because relief is granted by statute which may result in the appropriation of the grain which has been deposited by one bailor to satisfy the claim of another, either or both of these persons are thereby deprived of such other rights and remedies as previously existed at common law or by statute, in case of the misappropriation or unlawful conversion of personal property. The remedies specially created by the grain and warehouse law are not exclusive. They were intended to be and are auxiliary to those previously afforded.

In anticipation of the foregoing conclusion, the respondent contends that, to bring any transaction within the prohibition of the statute, the person to whom the transfer is made must, at the time of the transfer, be a creditor in a strictly technical sense, having and holding an immediately provable claim, a pre-existing debt against the insolvent, according to the word "debt" as used in this connection,—its most limited and narrow construction,—or that he must be a person resting under a liability in behalf of the insolvent; and that Palmer, although the holder of wheat receipts issued by Wells, was not a creditor, nor did he, nor did any holder of a like receipt, have a pre-existing debt, within the intent and meaning of the law, which, in defiance of its terms or otherwise, could be preferred. To state the argument in another form, it is that until the holder of such receipts has ascertained by action the amount he is entitled to recover by reason of default upon the part of the bailor, and has reduced his claim to a judgment, he is not a creditor, and consequently has no

rights whatsoever under the insolvency act. Further, that the only parties referred to in section 4, as to whom the conveyances therein specified are declared void, are—*First,* a limited class of persons who are creditors, as before defined; *second,* such persons as have incurred a liability for the insolvent,—such, for example, as sureties and indorsers; the line of thought being that the words, "shall be void as to all * * * persons receiving the same," in section 4, refer to and are limited by the preceding words, "or to any person under liability for such debtor."

The court below evidently concluded that the relation of debtor and creditor did not exist between the warehouseman, Wells, and either of the holders of his receipts, and also that, as there was nothing in the case tending to indicate that, when making the transfer and conveyance, Wells knew that Palmer held any of his wheat receipts, the same could not have been made "with a view" to paying or securing the latter, and for that reason not forbidden. The object of the insolvency act is to secure an equal distribution of the property of an insolvent debtor among his creditors, as is apparent from its title, and such interpretation must be given it as will further its purpose. *Simon* v. *Mann,* 33 Minn. 412, (23 N. W. Rep. 856.) There certainly can be no distinction between a preferential conveyance to a creditor directly and a preferential conveyance to him and for him through a third person, for the effect is the same. It has already been declared by this court, in proceedings against an insolvent, that the manner in which the preference complained of by the petitioning creditors is accomplished is immaterial, if the fact itself be established upon the hearing. *In re Stevens,* 38 Minn. 432, (38 N. W. Rep. 111.) Nor can it make any difference if Wells did not know, at the time of the alleged wrongful transfer, that Palmer held some of his receipts; for the transaction was "with a view" to providing for others,—for all who held receipts,—and not for Palmer alone. Clearly, the plaintiff's right to recover depends upon the actual relations which existed, under the circumstances of this case, between Wells, the insolvent warehouseman, and the persons for whose benefit the transfer and conveyance were made. Were they creditors, within the spirit and meaning of the act of 1881? If so, the jury having de-

clared that Palmer had reasonable cause to believe Wells insolvent when he made the deed and gave the order on which the former secured the sum of $8,000 cash assets of the insolvent, the transaction, must be adjudged a fraudulent and proscribed preference.

In *Wilder* v. *Peabody*, 37 Minn. 248, (33 N. W. Rep. 852,) it was held that a claim for rent, not payable in advance under the lease, where the lessor had not enjoyed the use of the leased premises, was not an existing demand, provable under chapter 148, *supra*. The rent might not become due, for the lessee might be evicted or the premises become untenantable. The very existence of the demand depended upon a contingency. In such a case the landlord could in no sense of the word be decided a creditor, and the reason is obvious. In *Mohr* v. *Minn. Elevator Co.*, 40 Minn. 343, (41 N. W. Rep. 1074,) this court had occasion to adopt and approve Bouvier's definition of a creditor, in proceedings in insolvency. It is one, he says, "who has a right to require the fulfilment of an obligation or contract." In this large sense it means more than a person to whom money may be owing. Burrill states that " the word 'debt' is of large import," and that, properly speaking, it "includes all that is due to a man under any form of obligation or promise;" and Lord Coke, in commenting upon the signification of the word "*debitum*," as used in the statute of Merton, *c.* 5, avers that "*debitum* signifieth not only debt for which an action of debt doth lie, but here in this ancient act of parliament it signifieth generally any duty to be yielded or paid." 2 Inst. 89. The same meaning is ascribed in *Frazer* v. *Tunis*, 1 Bin. 254; Ram, Assets, (2d Ed.) 3; 2 Williams, Ex'rs, 915.

Palmer and others held Wells's obligations or contracts to account for more than 10,000 bushels of wheat, valued at above $7,000. On the day he executed and delivered the instruments involved in this litigation, he had in store, with which to redeem receipts, only half the amount of wheat necessary for the purpose. He was hopelessly and irretrievably a bankrupt. He was preparing to depart from beyond the jurisdiction of the state, and next day removed to an adjoining territory. To illustrate the situation, should it be held that the holders of these receipts were not of the creditors mentioned in the law, let us suppose that the money and property (aside from the wheat)

obtained by Palmer had been unlawfully conveyed to a general creditor, or to a third person for the benefit of a general creditor, instead of to Palmer. That conveyance, no matter how fraudulent and preferential, could not be attacked in insolvency proceedings until those holding wheat receipts had followed them through the useless ceremony of a demand, and into judgments against Wells, (who in the mean time, and very promptly, had gone beyond the borders of our state,) if the court below was right in its conclusion of law; nor could these unfortunate owners of the receipts take any steps in proceedings in insolvency, or any part therein, until they had, in some manner not apparent to us, made the demand and obtained service of a summons upon Wells after he had gone from the state. and, in time, become his judgment creditors. Such a restricted view of the statute cannot be tolerated. We are clearly of the opinion that it includes and comprehends, as creditors of an insolvent debtor, all persons who hold receipts in the form hereinbefore mentioned, and that the transfer and conveyance, whereby they or any of them secure a preference over other creditors, cannot stand.

Finally, it is suggested that, as Palmer acted as an agent or trustee simply in the disbursement of the money, which was all paid out before this suit was begun, he must be exonerated. If his liability ever accrued, it was at the time he received the deed and order. It cannot be made to depend upon a contingency, such as the character in which he may be acting, or the time within which he completes the preference by disbursement of the money.

The judgment appealed from is reversed, and the case remanded to the district court, with orders that judgment be entered for the plaintiff in accordance with the views herein expressed.