(93 App. Div. 124.)

KELLOGG et al. v. SOWERBY et al.

(Supreme Court, Appellate Division, Fourth Department.  March 29, 1904.)

1. DECISION OF COURT ON APPEAL—LAW OF THE CASE.
    On a trial of a case after the court on appeal has decided that the
    complaint of plaintiff states a cause of action, it is only necessary to de-
    termine whether plaintiff's evidence fairly establishes the allegations
    of the complaint.

2. UNLAWFUL BUSINESS COMBINATION—ILLEGAL DISCRIMINATION—LIABILITY
    FOR DAMAGES SUSTAINED.
    Plaintiffs owned a grain elevator capable of handling 20,000,000 bushels
    of grain in a season.  Owners of other elevators at the same port formed
    an association, and agreed to accept as compensation one-half cent per
    bushel on all grain coming into the port for delivery to any elevator, to
    be distributed according to a schedule agreed on by the elevator owners
    in the association.  The association entered into contracts with railroad
    companies providing that the railroad companies would pay to the as-
    sociation one-half cent a bushel for all grain transported by them which
    came into the port directed to any elevator, and whether the grain was
    handled by the elevators in the association or not.  When the associa-
    tion and the railroad companies commenced operations under the con-
    tracts, the railroad companies refused to carry grain sent through plain-
    tiffs' elevator unless the shipper paid them an additional half cent per
    bushel.  The evidence showed that the railroad companies conspired with
    the association to injure plaintiffs' business and to prevent competition
    in elevating grain at the port, and that, for the purpose of carrying out
    the conspiracy, the association was formed and the contracts made.
    Held, that the association and the railway companies were liable to plain-
    tiffs for the injuries sustained because of the railroad companies sub-
    stantially discriminating against plaintiffs and in favor of the associa-
    tion, to which discrimination the association was a party.

3. SAME.
    It was immaterial that plaintiffs had a right of action against the as-
    sociation for any money paid to it by the railroad companies and received
    by them for grain shipped to plaintiffs' elevators.

4. RAILROADS—SHIPPERS ON BRANCH ROAD—DISCRIMINATION.
    A railroad company adopting the plan of sending its cars over a switch
    existing solely for the purpose of delivering freight to cars from shippers
    located on the switch is required to serve all shippers alike, and any dis-
    crimination against a shipper is unlawful.

Exceptions from Trial Term, Erie County.

Action by Spencer Kellogg and another against George P. Sowerby
and others.  There was a judgment dismissing the complaint at the
close of plaintiffs' evidence.  Plaintiffs moved for a new trial, which
was ordered heard in the Appellate Division in the first instance on a

case containing plaintiffs' exceptions. Exceptions sustained, and new trial granted.

The action was commenced on the 5th day of July, 1900, to recover damages sustained during the year 1900 because of acts of the defendants, claimed to be illegal, done under and pursuant to an alleged unlawful combination and a conspiracy on their part to deprive the plaintiffs of a reasonable opportunity to profitably operate a grain elevator owned by them, and to successfully compete in the handling of grain at the port of Buffalo with owners of other elevators similarly situated.

Argued before McLENNAN, P. J., and SPRING, WILLIAMS, and STOVER, JJ.

George L. Lewis (Simon Fleischmann, of counsel), for plaintiffs.
Spencer Clinton, for defendant Western Elevating Ass'n.
William L. Marcy, for defendant Erie R. Co.
John G. Milburn, for defendant Delaware, L. & W. R. Co.
Charles A. Pooley, for defendant New York Cent. & H. R. R. Co.
Martin Carey and James McC. Mitchell, for defendant Lehigh Valley R. Co.

McLENNAN, P. J.   The evidence very conclusively establishes that the conditions under which the plaintiffs were compelled to operate their elevator, the Kellogg, during the year 1900, were less favorable for the successful conduct of such business than those which pertained to the other rail elevators, so called, at the port of Buffalo, although for all practical purposes the Kellogg was as conveniently located and equipped as any of the others; that thereby the plaintiffs were unable to earn as much as they would have done, had such conditions been uniform.   If such result was occasioned by the unlawful acts of the defendants, done pursuant to an illegal combination on their part, or because of an unlawful discrimination enforced against the plaintiffs, they are entitled to recover any damages thus occasioned, no matter under what form of agreement the defendants may have acted, or what method of procedure they adopted.   What the plaintiffs or defendants may have done or omitted to do in previous years is unimportant, except as such acts or omissions may throw light upon the situation of the parties as it existed during the year 1900, or tend to explain the intent and purpose of the acts of the parties in the premises.   This action relates solely to what occurred in the year 1900; the claim being that during that year the defendants unlawfully combined, and, acting in concert and with a common purpose, pursued such course of conduct towards the plaintiffs as to prevent them from successfully operating their elevator or doing business thereat under as favorable conditions as the same was done at the other rail elevators located at the port of Buffalo, which are in competition with the plaintiffs' elevator, and that as a result the plaintiffs sustained substantial damages.   Upon an appeal from an interlocutory judgment in this case overruling a demurrer to the complaint, the judgment was affirmed, and this court unanimously decided that the complaint stated a cause of action.   61 App. Div. 35, 70 N. Y. Supp. 237.   Therefore upon this appeal it is only necessary to determine whether or not the plaintiffs introduced any evidence which fairly tended to establish the allegations of the complaint.

The defendant the Western Elevating Association was a joint-stock association organized in the spring of 1900 "for a term beginning with April 23, 1900, and ending March 31, 1901," by all the owners or representatives (about 20 in number) with the exception of the plaintiffs, of rail elevators, so called because connected with railroads, in the city of Buffalo, including the defendant railroad companies, "for the convenience of their business, and in order that they may render better service to the public." The elevators owned or controlled by the defendant railroad companies were located adjacent to their respective tracks. The others, or most of them, including the Kellogg (plaintiffs' elevator), were located upon or connected with the Buffalo Creek Railroad, which in turn was connected with each of the railroads of the defendant companies, and such road afforded the only railroad facilities available to such elevators. All were accessible to steamers or vessels from the lakes, and their cargoes of grain were discharged directly into such elevators, but they were all dependent upon the defendant companies for the transshipment of such grain by rail. No grain or other freight was delivered to the Buffalo Creek Railroad, except for transfer to connecting railroads. It had no cars or other necessary operating equipment, except engines, with which it conveyed cars from the other roads to shippers upon its line, and returned such cars to them when loaded. That was its only business, and for such service it received $1.10 from any railroad for each car so received from and delivered to it, which was added to the freight charges on any shipment so made. The situation of the plaintiffs in the spring of 1900 was that they owned the Kellogg Elevator, with a capacity to elevate about 20,000,000 bushels of grain in a season, located on the Buffalo Creek Railroad, precisely as were many of its competitors, accessible to the lake craft for the delivery of grain into it, but absolutely dependent upon the defendant companies for getting such grain out of it if it was to be shipped by rail. In the early part of the year 1900 negotiations began between the owners or representatives of all rail elevators at the port of Buffalo, including the defendant railroad companies, looking to the formation of the defendant association. Its real purpose was to establish and maintain uniform elevator charges, and undoubtedly, with that accomplished, the business could be done with greater convenience to the railroad companies, more expeditiously and satisfactorily, and with greater profit to the owners of elevators as a whole. The plan proposed was, in effect, to form an elevator pool or trust, by which the net receipts for elevating all grain coming into the port of Buffalo for delivery to any one of the rail elevators should be distributed according to a schedule of percentages to be agreed upon between the owners of all such elevators; such proceedings not depending entirely upon the amount of grain actually elevated by any elevator, but to some extent upon its estimated capacity, equipment, value, etc., so that in some cases an elevator might do little or no business during the year, and yet receive a substantial percentage of the profits earned by the other elevators belonging to the association. Earnest and strenuous efforts were made by the other owners of rail elevators, including the defendant companies, to induce the plaintiffs to join such association, and to accept a certain percentage of its net receipts. It was proposed that the ele-

vating charges for a year should be one-half cent per bushel (less than the elevator charges authorized by law). The plaintiffs apparently were not averse to the proposed plan of doing business, but insisted that they should receive a larger percentage of the net receipts of the association than was offered, and demanded a bonus in addition, which demand was considered unfair and unreasonable by the owners of the other elevators. As a result of such negotiations, the plaintiffs refused to become members of the association to be formed, and announced their intention of running the Kellogg Elevator as an independent concern, and in competition with the others.

For the purposes of this appeal, we may assume that the proposed arrangement by the elevator owners, and the formation of the association to give effect to the same, was not illegal. It was, in effect, that all the owners of rail elevators at the port of Buffalo should devote their respective properties to the purposes of the association; that it should agree to properly elevate all grain consigned to any of such elevators, at a price less than they were authorized by law to charge, to wit, one-half cent per bushel; and that the net profits of such elevating should be distributed among such elevator owners in accordance with a rate of percentages also agreed upon. If we assume it was entirely competent for the owners of elevators in the city of Buffalo—any or all of them—to enter into such an agreement, it certainly was also within the rights of the plaintiffs to refuse to join such proposed association, or to accede to its suggested plan of operation in the premises. The plaintiffs had an absolute right to say, "The Kellogg Elevator, which is owned by us, we propose to run and operate as an independent concern, and will invoke the protection of all law to enable us to successfully operate it in competition with the other rail elevators at the port of Buffalo, whether members of any association or otherwise." Under these conditions the defendant association was formed, and, as we have seen, included all the persons and corporations owning or interested in rail elevators at the port of Buffalo, with the exception of the plaintiffs. The agreement forming the defendant association, among other things, provided:

"In case of the failure to come into the Association of any elevator or elevators named in said schedule, then and in that case the percentage of net earnings allotted to such elevator or elevators shall be divided pro rata according to per cent. shown. between the other elevators in the Association."

Simultaneously with the organization of such association, a contract was entered into between it and each of the defendant railroad companies, which provided, in substance, that such railroad company would pay to the defendant association one-half cent per bushel for all grain transported by it which came into the port of Buffalo directed to any rail elevator, and independent of whether such grain was handled by the association elevators, or by those not belonging to or controlled by it. In other words, by such agreements the defendant companies agreed to pay elevator charges of one-half cent per bushel to the defendant association for all grain elevated in the rail elevators of the city of Buffalo and carried by such railroad companies, whether such grain was elevated by the association elevators, by the plaintiffs, or the elevators of other parties in no manner connected with such association.

Such contracts were made by the defendant companies separately, but, in form and substance, were substantially alike. In short, the defendant companies, not as elevator owners but as common carriers, agreed to pay to the defendant association, composed of elevators which were in competition with the plaintiffs' elevator, one-half a cent a bushel for all grain elevated by the plaintiffs' elevator, with which the defendant association had nothing to do, and had expended no labor and incurred no expense in connection therewith.

We may assume that the plaintiffs are not entitled to complain because of the organization of the defendant association, or on account of the contracts entered into between it and the defendant companies, provided the acts of the defendants, done under or in pursuance thereof, were not such as to unjustly prejudice the plaintiffs' legal rights in the premises, among which was the right to operate their elevator upon equal terms with their competitors—its location, equipment, management, and all other conditions being as favorable for the transaction of its business—and the right to have grain which was elevated by it carried to its destination by any of the defendant companies upon the same terms as grain handled by the competing elevators was carried. When the defendants commenced operations under the contracts referred to, precisely what was to be expected happened. The natural and logical result followed, to wit, the defendant companies sought to reimburse themselves for the one-half cent a bushel which they agreed to pay to the defendant association on grain carried by them, even if elevated by the Kellogg Elevator, and which such association had in no manner earned. That was accomplished by compelling the plaintiffs, in effect, to pay to such companies one-half cent a bushel as elevator charges for all grain delivered to them for transportation by the Kellogg Elevator, instead of paying such charges to the plaintiffs, the result of which was to make all grain which passed through the Kellogg Elevator pay a charge of one cent a bushel, in case the owners of the Kellogg Elevator received one-half a cent a bushel for elevator charges, the amount received by all the other rail elevators at the port of Buffalo. The precise method adopted to accomplish such result was very simple, and at the same time most effective. Elevator charges of one-half cent a bushel were added to the freight charges upon all grain carried by the defendant companies, and which was delivered to them through the rail elevators, including the Kellogg. Such elevator charges were collected by the railroad companies from the consignees of such grain and paid over to the defendant association, to be afterwards distributed among its members, no part of which, however, would go to the plaintiffs, notwithstanding the fact that a considerable portion of such grain had been elevated by them. In case the plaintiffs insisted that they should receive one-half cent a bushel for elevating such grain, the same as the owners of the other rail elevators received, then such grain was made to pay one cent a bushel for elevator charges. The evidence clearly establishes that, under the agreements entered into between the defendants, and the method adopted for carrying out such agreements, the result was that, if the plaintiffs received one-half cent a bushel for grain elevated by them in the Kellogg Elevator, such grain, if carried by the defendant companies, was obliged to pay one cent a bushel as

elevator charges, whereas there was a charge of only one-half a cent per bushel for all grain passing through the other rail elevators at the port of Buffalo during the year 1900. The evidence also very clearly shows that, because of such conditions, shippers of grain were deterred from using the Kellogg Elevator in the spring of 1900. In fact, no other result could be expected, than that the Kellogg Elevator would be substantially put out of business. Shippers of grain would not pay one cent a bushel elevator charges for the sake of sending their grain to the Kellogg Elevator, when they could obtain equally as good elevator service for one-half a cent a bushel through its competitors.

It is not seriously contended in the exhaustive briefs presented by the able counsel for the respective defendants that the conditions which prevailed in respect to the Kellogg Elevator in the spring of 1900 were not such as to prevent it from successfully competing with the other rail elevators similarly situated at the port of Buffalo. The situation as it existed was injurious to the plaintiffs—tended to destroy their business and render their property unproductive. The evidence tends to show that such result was brought about by a combination, by the concerted action of all the defendants, and that such was their intent and purpose in entering into the agreements, and in doing the acts referred to. The negotiations leading up to the organization of the defendant association, the agreements executed by each of the defendant companies, and their acts thereunder, all tend to prove that it was the intent and purpose of the defendants to compel the plaintiffs to cease operating the Kellogg Elevator in competition with the others, or to run it at a loss. An examination of the whole evidence leads us to the conclusion that it tends to prove that the defendant railroad companies combined and conspired with the defendant association, a competitor of the Kellogg Elevator, to injure the plaintiffs' business, and to prevent competition in elevating grain at the port of Buffalo during the season of 1900, and that, for the purpose of carrying out such conspiracy, the association was organized and the contracts referred to were made; that in pursuance thereof the defendant companies refused to carry grain from the Kellogg Elevator upon as favorable terms as from its competitors; and that, in consequence of such agreements, and the acts done thereunder, the plaintiffs sustained substantial damage. If we have correctly interpreted the evidence, it cannot be doubted that the plaintiffs are entitled to recover the damages thus occasioned. It is unimportant that the organization of the defendant association, and the agreement between its members as elevator owners, was not illegal; that the full performance of all its provisions would not have afforded the plaintiffs legal ground for complaint, even if they sustained damage thereby. Unquestionably, any number of elevator owners have the right to adopt a plan of co-operation, to protect their common interests, and to prevent a hostile and unprofitable competition for business between themselves, and, to that end, may agree to place their earnings in a common pool, and to divide them pro rata upon the basis of agreed percentages. Michael v. Prussian National Ins. Co., 171 N. Y. 25–37, 63 N. E. 810. Certainly, if by such arrangement elevating charges were not unduly in-

87 N.Y.S.—27

creased, and proper and adequate facilities were afforded to the pub-lic, it was not unlawful, and in no manner infringed upon the legal rights of the owner or owners of other elevators.   In this case the plaintiffs do not complain because of the agreement entered into be-tween the owners of elevators, as such, members of the defendant as-sociation, but because such agreement was one of the instruments which was employed, in conjunction with the contracts executed by the several defendant companies, to destroy the plaintiffs' business, and because of the acts done by all of the defendants acting in con-cert, and with the common purpose of bringing about such result. The contracts which made the plan effective were those executed by the defendant companies as common carriers, and not as owners of elevators; and, as we have seen, the evidence tends to show that the defendant association was organized for the purpose of enabling such contracts to be made by the defendant common carriers.   Such com-panies could not protect their interests as elevator owners by enter-ing into contracts as common carriers, which, as such, they were by law prohibited° from making.   It must therefore be determined whether or not the purpose of the defendants, and the means em--ployed by them to prevent the Kellogg Elevator from doing business under as favorable conditions as its competitor, the defendant as-sociation, were unlawful, for, if not, the plaintiffs cannot complain, no matter how serious the consequences to them.   At the foundation of every tort must lie some violation of a legal duty, and therefore some unlawful act or omission.   Whatever or however numerous or formidable may be the allegations of conspiracy, of malice, of oppres-sion, of vindictive purpose, they are of no avail—they merely heap up epithets—unless the purpose, or the means by which it was to be accomplished, is shown to be unlawful.   Rich v. R. R. Co., 87 N. Y. 382–393.

Was the defendants' purpose respecting the business of the Kel-logg Elevator, and the means employed to carry the same into effect, unlawful?   The evidence tends to show that the purpose was to de-stroy the business, and that the means employed was to compel grain transported from it to pay one cent a bushel elevator charges, in case the plaintiffs received the same compensation for elevating as did the owners of all other rail elevators at the port of Buffalo simi-larly situated.   Result, purpose carried out, and plaintiffs' business substantially destroyed.   What the defendants did, or might have done, simply as elevator owners, may be eliminated from considera-tion.   Was what the defendant companies did as common carriers, acting under and in pursuance of the contracts made by them sepa-rately with the defendant association, unlawful?   That it effected a substantial discrimination against the plaintiffs, and in favor of the defendant association, its competitor, is plain.   We think it was un-lawful for the defendant companies to refuse to carry grain from the plaintiffs' elevator upon the same terms as it carried grain from the elevators of the defendant association.

Vincent et al. v. C. & A. R. R. Co., 49 Ill. 33, was an action brought to recover damages against the defendant for refusing to deliver cars to their elevator upon the same terms as it delivered cars to other

elevators similarly situated. It was held that the plaintiffs could recover. The court said:

"* * * It need only be said that a railway company, although permitted to establish its rates of transportation, must do so without injurious discrimination as to individuals. It must deal fairly by the public, and this it would not be doing if allowed so to discriminate as to build up the business of one person to the injury of another in the same trade."

Chicago & North Western Railway Co. v. People ex rel. Hempstead, 56 Ill. 365, 8 Am. Rep. 690.

In the case of Coe v. Louisville & Nashville R. R. Co. (C. C.) 3 Fed. 775, the whole question is discussed by Chief Judge Baxter in a very exhaustive opinion, and the conclusion is reached that it is not permissible for a common carrier to discriminate in the handling of freight of the same character offered by two individuals, and similarly situated. The Vincent Case, supra, is cited with approval, and in the course of the opinion it is said:

"Impartiality in serving their patrons is an imperative obligation of all railroad companies. Equality of accommodations in the use of all railroads is the legal right of everybody. The principle is formed in justice and necessity, and has been uniformly recognized and enforced by the courts. A contrary idea would concede to railroad companies a 'dangerous discretion, and inevitably lead to intolerable abuses. * * * By an unjust exercise of such a power they could destroy the business of one man and build up that of another— punish an enemy and reward a friend. * * *"

We conclude that the acts of the defendant companies in refusing to handle grain from the Kellogg Elevator upon the same terms that they handled grain from the other elevators was unlawful, and such refusal being the natural result, and that contemplated by the defendant association when it entered into the contracts referred to with said companies, it became a party to such unlawful acts, and equally liable with the other defendants therefor.

It is not important that the plaintiffs may have had a right of action against the defendant association for any moneys paid to it by the railroad companies, and received by them, for the elevation of grain by the plaintiffs at the Kellogg Elevator. Under the plan adopted by the defendants, the elevator charges were collected by the railroad companies, and such charges belonged and should be paid to the owners of the elevators through which the grain passed, unless such owners otherwise agreed; and therefore payment to any one else was improper, and can be recovered from those making it. Neither is it important that the plaintiffs' elevator was located upon the Buffalo Creek Railroad, and that the grain was delivered to the defendant companies by means of that road. As we have seen, it was simply a branch road or a switch, accessible to all the railroads, and existed solely for the purpose of delivering freight to them from shippers located upon its line; the charge for such service being uniform. The defendants, under the circumstances, were not at liberty to discriminate against the defendants because of those conditions. Undoubtedly they might have refused to send their cars over said road for the convenience of any shipper, but, having adopted the plan of doing so, they had no right to make an exception as against the plaintiffs. Wight v. United States, 167 U. S. 512, 17 Sup. Ct. 822, 42 L. Ed. 258.

It follows that the plaintiffs are entitled to recover in this action the damages sustained by them up to the time of its commencement, in case the facts are found in favor of the plaintiffs. The plaintiffs' exceptions should be sustained, and the motion for a new trial granted, with costs to the plaintiffs to abide event.

Plaintiffs' exceptions sustained, and motion for a new trial granted, with costs to the plaintiffs to abide event. All concur.