J. C. SULLIVAN and Others v. MINNEAPOLIS & RAINY
RIVER RAILWAY COMPANY.[1]

May 29, 1913.

Nos. 17,968—(68).[2]

**Action for unlawful discrimination by carrier — domestic traffic — jurisdiction.**

1. The jurisdiction of the state courts of an action by a shipper against a common carrier for damages resulting from unlawful discrimination against him in rates, is not affected by the provisions of the Interstate Commerce Act, where the shipments involved are within points within the state and the transportation is wholly therein; and, where such appears from the complaint, a demurrer for lack of jurisdiction by reason of such act should be overruled, especially where there is no suggestion in the complaint that the defendant was ever engaged in interstate commerce or that its road is so situated as to enable it to engage therein.

**Equality of freight rates for same class and same distance.**

2. The modern common law imposes upon common carriers the duty of equality in freight rates to all shippers similarly circumstanced, for the transportation of the same class of goods the same distance; and our statutes prohibiting such discrimination are declaratory of the common-law rule.

**Common-law right of action remains.**

3. The shipper's common-law right of action for damages for discrimination in rates is not taken away by our rate-regulating statutes, which furnish no civil remedy to the shipper therefor.

**Same.**

4. The shipper would have such a right of action, even though the statutory prohibition of discrimination in rates were deemed to create a new obligation on the part of the carrier, no civil remedy being provided thereby.

**Measure of damages.**

5. In such an action, whether based upon the common law or the statutory duty not to discriminate in rates, the shipper may recover the difference between the charges exacted of him and those accepted from the most favored shipper; and though the rates charged the plaintiff were those established by law, such a recovery neither compels the defendant to commit a second wrong, nor in any way affects the legally-established rates.

[1] Reported in 142 N. W. 3.                    [2] April, 1913, term calendar.

Action in the district court for Itasca county to recover $5,366.58, excess charges made by defendant carrier against plaintiff over and above the amount charged the Itasca Lumber Company for similar shipments between the same points. Defendant demurred on the grounds (1) that the court had no jurisdiction of the subject matter of the action and (2) that the complaint did not state facts sufficient to constitute a cause of action against defendant. The demurrer was sustained, Stanton, J. From the order sustaining the demurrer, plaintiffs appealed. Reversed.

*George H. Spear* and *Kingman & Wallace,* for appellant.

*Powell & Simpson* and *Ernest C. Carman,* for respondent.

PHILIP E. BROWN, J.

Appeal by the plaintiff from an order sustaining a demurrer to the complaint. Two causes of action are attempted to be stated therein, the first of which is, in substance, that the defendant, a Minnesota corporation, is and was, at all times referred to, engaged as a common carrier in operating a railway extending north from a certain station known as Mississippi River, in Itasca county; that, during the times stated, the plaintiffs and an Illinois corporation, known as the Itasca Lumber Company, were logging in certain territory served by the defendant as a common carrier, the plaintiffs and the Itasca Lumber Company being competitors, each shipping large quantities of logs over the defendant's railway to its terminus at Mississippi River, in the course of which, between December 1, 1909, and January 1, 1911, the plaintiffs shipped over the defendant's road, from points in the state to Mississippi River, several million feet of logs, paying the defendant therefor its regularly established and published rate of $2 per thousand feet, and believing, in so doing, that this represented the charge made by the defendant as against the public in general and all parties similarly situated with the plaintiffs; that during the same period the Itasca Lumber Company also shipped and the defendant carried for it, as a common carrier, large quantities of logs the same or a greater distance than that covered by the plaintiffs' shipments, the service thus rendered to the plaintiffs and the Itasca Lumber Company being like and contem-

poraneous; and that the defendant transported the logs of the latter under the same conditions, except as to rates, as those of the former, but that the Itasca Company paid the defendant, and it accepted for the service so rendered, the sum of $1.50 per thousand feet of logs, thereby giving such company an unlawful preference over the plaintiffs and unlawfully subjecting them to an unreasonable prejudice, and thus unlawfully and unjustly discriminating against the plaintiffs in collecting and receiving from the Itasca Company a less compensation for services in transporting the logs than the regularly established schedule rates and charges enforced by the defendant as a common carrier against the public in general and these plaintiffs in particular, for like and contemporaneous service in transporting logs; and that by reason of all of the facts alleged "the plaintiffs have suffered damages in the sum of $4,556.24."

The second cause of action is substantially a repetition of the first, except that the subjects of the shipment alleged consisted of lumbering supplies, horses, feed, etc., and the defendant is charged with having carried those of the Itasca Company for nothing, while the plaintiffs were compelled to and did pay the regular established rates, aggregating about $800, for which the plaintiffs also demand judgment.

The grounds for the demurrer are: (1) That the court was without jurisdiction; and (2) that the complaint does not state a cause of action. It does not appear on what theory the court based its ruling.

1. It is unnecessary, we think, to go into any extended discussion of the first ground of demurrer. The shipments involved in both causes of action were between points within the state and the transportation was wholly therein. Moreover, there is no suggestion in the complaint that the defendant was ever engaged in interstate commerce, or that its road is so situated as to enable it to engage therein. Under these circumstances, the shipments must be deemed to have been intrastate, and the Federal act has no application. The demurrer cannot be sustained upon the first ground.

2. The questions raised by the general demurrer are: (1) What is the common-law duty of a common carrier to shippers similarly

circumstanced, with reference to equality of charges for the carriage of the same class of goods the same distance? (2) Has a shipper discriminated against under such circumstances any right of action for damages at common law, and if so what is the measure of his recovery? (3) What is the effect of our statutes relating to the regulation of railroad rates upon the questions here involved?

(1) While discrimination by railroads as to shipping facilities has been recently condemned by this court, through Chief Justice Start, in Banner Grain Co. v. Great Northern Ry. Co. 119 Minn. 68, 137 N. W. 161, 41 L.R.A.(N.S.) 678, the questions above stated have not been considered. Looking backward from the present viewpoint at the course of events, and had we no precedents to consider, no difficulty would, we think, be encountered in their determination; but, either fortunately or unfortunately, as it may be regarded, there is a wealth of authority upon the subjects involved, and our first effort will be to extract the common-law rule therefrom.

The earlier cases, of which Johnson v. Pensacola, 16 Fla. 623, 26 Am. Rep. 731, is an example, declared that a common carrier performed its full common-law duty, when it served all alike in the matter of facilities for a reasonable compensation. This view probably originated because of the paucity of early English cases upon the common-law rule as to discrimination in tolls, which latter is not surprising, when we consider that the first common carriers were individuals whose fields of operation were of necessity extremely limited, and that they were many in number, performing services in various portions of the country and under widely differentiating circumstances. Under such a condition of affairs, and, moreover, when the doctrine of equal rights to all was in its infancy, and when competition, which makes special privilege almost necessarily disastrous to the disfavored party, may almost be said to have been nonexistent, it is not at all strange that the conception of a fixed and equal charge to every man for the same service remained undeveloped.

In England legislation establishing equality in railroad rates came so soon after the advent of railroads that there was slight occasion for the courts there to examine into the common law of the subject independently of statute. See Scofield v. Railway Co. 43

Ohio St. 571, 598, 3 N. E. 907, 54 Am. Rep. 846. But later, when the question of the true common-law rule became of prime importance, further investigation brought to light broader principles. Said Mr. Justice Roe in McDuffee v. Portland, 52 N. H. 430, 455, 456, 13 Am. Rep. 72:

"It seems to be supposed that, at common law, common carriers are not bound to carry all and for all on reasonably equal terms. * * * The principal English cases usually cited are" [citing many cases]. "These cases seem to be based on statutes general or special. The English parliament has been extremely vigilant and industrious in putting, in charters of corporations, provisions for the protection of the rights of individuals and the public. Out of abundant caution, and for the information of those specially concerned, and to guard against any possible construction by implication repealing the common law, they affirmed some of its simplest rules. Sandford v. Railroad Co. 24 Pa. St. 378. * * * And the practice of the English courts, on charters and general acts of this kind, has been so long continued, that the fact seems now to be overlooked that the general principle of equality is a principle of the common law. * * * It seems to have been a result of the anxiety of parliament, that, instead of merely providing such new remedies and modes of judicial procedure as they deemed necessary for the enforcement of the common law, they repeatedly re-enacted the common law, until it came to be supposed that, in such an important matter as the public service of transportation by common carriers, the public were indebted, for the doctrine of equal right, to the modern vigilance of parliament, instead of the system of legal reason which had been the birthright of Englishmen for many ages. A mistake of this kind is an evil of some magnitude. It unjustly weakens the confidence of the community in the wisdom and justice of the ancient system, and impairs its vigor. When the understanding prevails that equality, in a branch of the public service so vast as that of transportation by common carriers, depends upon the action of a legislature declaring it by statute, and attempting the difficult task of accurately expressing the whole length and breadth of the doctrine in words not defined in the common law, public and common rights of immense value are

removed from a natural, broad, and firm foundation, to one that is artificial and narrow, and consequently less secure; and many results of ill consequence flow from such a misconception of the free institutions of the common law."

In this connection the case of Tift v. Southern Ry. Co. 123 Fed. 789, is also pertinent. Said Mr. Justice Speer, at page 791:

"The difference in the obligation of a common carrier and that of a private individual is that the former has undertaken a duty to the public. Having undertaken that duty, it was settled by the common law that the common carrier must carry for all, to the extent of his capacity, without unjust or unreasonable discrimination either in charges or in the facilities for actual transportation."

That the English statutes are merely declaratory of the common law, is clearly announced and well sustained by many other American cases. See Messenger v. Pennsylvania, 36 N. J. L. 407, 412, 13 Am. Rep. 457; Same v. Same, 37 Id. 531, 18 Am. Rep. 754; Shipper v. Pennsylvania, 47 Pa. St. 338, 341; New England v. Maine, 57 Me. 188, 2 Am. Rep. 31. See also Baldwin, American R. R. Law, 350. And say Beale and Wyman, on Railroad Rate Regulation, page 670:

"The cases requiring the same rate to shippers who ask for the same transportation of the same goods at the same time and under the same conditions may seem fewer in number than those which are more conservative. But this principle was made law in many states by an impatient public who demanded statutes so that there could be in the future no equivocations, before many courts had time to express their opinion and before other courts had time to recant. And upon the whole it is claimed with confidence that outright personal discrimination is opposed to modern common law principles."

So also Mr. Noyes, in his work on American Railroad Rates, remarks, at pages 104, 105:

"This rule of the common law, that if the rate given to one shipper be reasonable in itself he has no interest in the rate given to other shippers, could only have been justifiable in the days of carriers by wagon. It is fundamentally unsound when applied to railroads. * * * The shipper *does* have an interest in the rate charged other

shippers. He has a right to demand that the railroad shall afford him the same treatment as his competitors. The question of relative rates is often of more importance than that of absolute charges."

So, while it may be true, as stated by Beale and Wyman, supra, that the cases announcing the modern doctrine are fewer in number, they are, nevertheless, too numerous to cite in full, and it is sufficient, in addition to those already mentioned, to refer to the following: Kansas v. Bayles, 19 Colo. 348, 351, 35 Pac. 744; Chicago v. People, 67 Ill. 11, 17, 16 Am. Rep. 599; Vincent v. Chicago, 49 Ill. 33; Kellogg v. Sowerby, 93 App. Div. 124, 87 N. Y. Supp. 412; Hays v. Pennsylvania Co. 12 Fed. 309; Samuels v. Louisville & N. R. Co. (C. C.) 31 Fed. 57, 59; Louisville v. Wilson, 119 Ind. 352, 21 N. E. 341, 4 L.R.A. 244; Lumber Co. v. Railroad, 141 N. C. 171, 176, 53 S. E. 823; Same v. Same, 136 Id. 479, 48 S. E. 813; State v. Central Vermont, 81 Vt. 463, 71 Atl. 194, 130 Am. St. 1065.

The evils of rate discrimination need no comment, and the capacity of the common law, through its adaptability to changed conditions, to meet them, in a measure at least, would seem to be unquestionable, even though it should be conceded that at one time there was no common-law rule against discrimination as such. Our own decisions in this regard are well summarized by Mr. Dunnell as follows:

"The common law is not a code of inflexible and logically consistent rules, but a body of broad and comprehensive principles, based upon reason, justice, and practical considerations," and "its development has been determined by the social needs of the community." 1 Dunnell, Minn. Dig. § 1502.

In other words, the common law is the legal embodiment of practical sense.

"The common law," declared the present Chief Justice in State v. St. Paul, M. & M. Ry. Co. 98 Minn. 380, 400, 108 N. W. 261, 28 L.R.A.(N.S.) 298, 120 Am. St. 581, 8 Ann. Cas. 1047; "is not a codification of exact or inflexible rules for human conduct, for the redress of injuries, or protection against wrongs, nor yet a mere figment of judicial genius; but, on the contrary, is the embodiment of broad and comprehensive unwritten principles, inspired by natural reason, and innate sense of justice, adopted by common consent for the regu-

lation and government of the affairs of men. It is the growth of ages, and an examination of many of its principles, as enunciated and discussed in the books, discloses a constant improvement and development in keeping with advancing civilization and new conditions of society. Holmes, Common Law, 1–5, 36, et seq. Its guiding star has always been the rule of right and wrong, and in this country its principles demonstrate that there is in fact, as well as in theory, a remedy for all wrongs."

We are content to align ourselves with those courts which have declared that the modern common law imposes upon common carriers the duty of equality in tolls to all shippers similarly circumstanced, for the transportation of the same class of goods the same distance.

(2) The next question presented by the general demurrer, in the order above enumerated, is as to whether a shipper who has been discriminated against has, at common law, a right of action against the carrier for damages, and, if so, what is the measure of his recovery.

"Ordinarily," said Mr. Justice Wallace, in Menacho v. Ward (C. C.) 27 Fed. 529, 534, "the remedy against a carrier is at law for damages for a refusal to carry, or to recover the excess of charges paid." In Hays v. Pennsylvania Co. supra, the plaintiff recovered the amount of freight paid by him in excess of the rates accorded to his most favored competitor. In Louisville v. Wilson, supra, a similar recovery was allowed. In Samuels v. Louisville & N. R. Co. supra, 58, a demurrer was overruled to an allegation of damages, that "by reason of such discrimination and charges for freight against them (plaintiffs), they were injured in their business as common carriers on the river, and were put to expense, trouble and increased risk in carrying their freight long distances on the river, to obtain carriage for it to points of destination, for which alleged injury to them they bring this complaint and suit for damages." These cases involved the common-law remedy only. So also in Lumber Co. v. Railroad, supra, which involved a statute declared to be merely an enactment of the common law, but which made no provision for damages, the difference between the rates paid by the plaintiff and the more favored shipper was recovered. In Pennsylvania R. Co. v. International Coal Min. Co. 173 Fed. 1, 7, 97 C. C. A. 383, a recovery

of the difference in the amounts paid by the plaintiff and by the favored shipper was sustained in an action for unjust discrimination in violation of the Interstate Commerce Act, though damages are provided for thereby merely in general terms, the provision being, section 8, that the carrier "shall be liable to the person or persons injured thereby for the full amount of damages sustained in consequence of any such violation of the provisions of this act." [1]  In answer to the defendant's contention that the measure of recovery was "not the lowest rate charged by the railroad to another shipper, but the general average paid on all shipments made by such shipper," the court said, at page 7:

"Whatever may be argued in support of the equity of such a rule, the simple answer is that Congress made no such rule. The purpose of the act is clear, viz., to·enforce equality of rate for like service in every case, and the mischief is done when for that service a shipper is charged more than any other shipper is charged for 'any service rendered, or to be rendered, in the transportation of passengers or property.' So long as it charges a lower rate for any shipment, the law is defeated, although on other shipments it may charge the proper rate."

The same rule of damages follows from the construction placed upon the so-called "equality clause" of the English statutes and charters, after which sections 2 and 3 of the Federal act were patterned, a discriminating rate being deemed extortionate to the extent of the discrimination, without regard to its inherent reasonableness. Thus, in Great Western Ry. Co. v. Sutton, 4 Eng. & Ir. App. 226, quoted in Scofield v. Railway Co. supra, 615, the court said:

"When it is sought to show that the charge is extortionate, as being contrary to the statutable obligation to charge equally, it is immaterial whether the charge is reasonable or not, it is enough to show that the company carried for some other person or class of persons at a lower charge during the period throughout which the party complaining was charged more under the like circumstances."

As soon, therefore, as the duty of equality is established, by reference either to the common law or to statute, the general damages incident to a violation thereof obviously include the difference be-

[1] [24 St. 382, § 8, U. S. Comp. St. 1901, 3159.]

tween the charges involved in the discrimination, whether, as in the English case cited, they be viewed as flowing from extortionate or excessive charges, or, as in our conception thereof, they be deemed as purely compensatory by way of restoration of equality. The wrong complained of being unlawful discrimination, the damages inevitably incident thereto must include the difference between the amount paid by the shipper from whom the full rate is exacted and that accepted from the more favored one. Any other conclusion would, in many cases, deprive the shipper of the benefit of the rule of equality, and we would have the resultant anomaly of the invasion of a right coupled with the denial of a remedy. We will have occasion to discuss this subject further when we come to consider the effect of our statutes. The question as to whether other damages may be recovered is not involved on this appeal.

(3) This brings us to the third question raised by the defendant's second ground of demurrer, as outlined above, viz., what is the effect of our statutes relating to the regulation of railroad rates upon the matters in hand?

These acts, so far as here material, are as follows:

R. L. 1905, § 2007: "All charges made by any such carrier for the transportation of passengers or property, whether over one or more railroads, or in connection therewith, or for the receiving, delivering, storage, or handling of such property, shall be equal and reasonable; and every unequal or unreasonable charge for such service is prohibited. One carload of freight of any kind or class shall be transported at as low a rate per ton, and per ton per mile, as any greater number of carloads of the same kind and class from and to the same points of origination or destination."

R. L. 1905, § 2009: "It shall be unlawful for any common carrier to make or give any unequal or unreasonable preference or advantage to any particular person, company, firm, corporation or locality, or any particular description of traffic in any respect whatsoever; or to subject any particular person, company, firm, corporation or

121 M.—32.

locality or any particular description of traffic, to any unequal or unreasonable prejudice in any respect whatsoever."

R. L. 1905, § 2011 prohibits pooling.

R. L. 1905, § 2012, as amended, provides for the filing of schedules of rates at certain places convenient for inspection.

R. L. 1905, § 2015, reads: "No such carrier shall charge, demand, collect, or receive for any service a greater or less sum than that fixed in its published schedules."

Laws 1905, p. 226, c. 176, § 3, provides: "The schedule of rates and charges for the transportation of freight and cars, together with the classification of such freights, minimum weights and rules now in effect, and all rates, charges and classifications published by any common carrier after the passage of this act shall be deemed just and reasonable and shall not be changed except upon the order of or by the written consent of the railroad and warehouse commission, hereafter called the commission. The terms of this act shall also apply to all schedules of rates and charges published by two or more common carriers jointly."

Laws 1905, p. 228, c. 177, provides, "It shall be unlawful for any common carrier in this state, by any special rate, rebate, drawback, or other device to directly or indirectly charge, demand, collect or receive from any person, firm or corporation a greater or less compensation for any service rendered in the transportation of any property within this state than its regular established schedule of rates and charges for like and contemporaneous service for any other person or for the public generally; and it shall be unlawful for any such common carrier directly or indirectly to offer or give any shipper in connection with, or as an inducement or reward for receiving any property for transportation from any such shipper, any gift, gratuity, or free pass whereby any passenger or freight shall thereafter be transported over the lines of such common carrier free, or at any rate less than that offered to the public, and in either such case such common carrier shall be deemed guilty of unjust discrimination and shall be punished by a fine not exceeding five thousand dollars. And any person who shall knowingly either for himself or for any firm or corporation directly or indirectly receive from any common carrier

any such reduction of rate, rebate, gratuity or other favor as is herein declared to be an unjust discrimination by such common carrier shall be guilty of a misdemeanor."

Laws 1909, p. 144, c. 136, establishes maximum freight rates in this state, and chapter 195, p. 220, provides a remedy for the recovery of charges in excess of the established rates. And Laws 1911, pp. 70, 104, cc. 50, 87, relate to investigation of the equality, justness, and reasonableness of established rates, and to the readjustment thereof when found necessary.

The effect of these statutes upon the rights of a shipper who has suffered an unjust discrimination, has two aspects, the first being whether his common-law remedy had been abrogated thereby, and the second whether, independently of the common law, he has any right of action under the statutes, and, if so, what is the remedy? Before entering upon the specific discussion of the first, however, it will be well to advert to the general principles determinative of the effect of statutes generally upon existing rights and remedies. In Daniels v. Palmer, 41 Minn. 116, 119, 42 N. W. 855, it was held that "the remedies specially created by the grain and warehouse law are not exclusive," but "were intended to be and are auxiliary to those previously afforded." In Eliason v. Sidle, 61 Minn. 285, 287, 63 N. W. 730, the court shortly disposed of a contention that a certain statutory remedy was exclusive, by declaring that "the plaintiff's right pre-existed the statute, which simply gave a new remedy." In Wacholz v. Griesgraber, 70 Minn. 220, 73 N. W. 7, it was held that an evicted tenant's statutory remedy by way of restitution was not exclusive of his right to maintain trespass, the court observing at page 224:[1] "This is a cumulative remedy. It is not made exclusive by the statute, and the general rule applies that when the common law gives a remedy and another remedy is provided by statute, the latter is cumulative, unless made exclusive by the statute." To the same effect, see Merz v. County of Wright, 114 Minn. 448, 451, 131 N. W. 635, where the present Chief Justice declared it to be "elementary that common-law remedies may always be resorted to for the enforcement of rights, even where a remedy is provided by express statute, unless the statu-

[1] [73 N. W. 9.]

tory remedy is made exclusive." In Way v. Barney, 116 Minn. 285, 133 N. W. 801, 38 L.R.A.(N.S.) 648, Ann. Cas. 1913A 719, it was declared that "if a man has a clear legal right, he must have a remedy for its enforcement," Chief Justice Start remarking further, at page 293,[1] that "if the statute does not furnish an adequate remedy, in cases where the right is not a statutory one, equity will find an efficient remedy." In Zetterberg v. Great Northern Ry. Co. 117 Minn. 495, 498, 136 N. W. 295, 296, it was held that the common-law rights of shippers were not affected by the reciprocal demurrage law, the purpose of such law being to create additional statutory rights, and the common-law right of action for unreasonable failure of the carrier to furnish cars being declared, at page 498, to be a valuable one, so that "it cannot be assumed that the legislature intended to abrogate it unless such intention is clearly expressed."

Nor is the rule different where the statute imposes a criminal penalty. Eliason v. Sidle, supra, 287; Daniels v. Palmer, supra. Said the court in the case last cited, at page 119:

"But no sound reason can be advanced for holding that because the wilful neglect or refusal before mentioned is declared a crime, or because relief is granted by statute which may result in the appropriation of the grain which has been deposited by one bailor to satisfy the claim of another, either or both of these persons are thereby deprived of such other rights and remedies as previously existed at common law or by statute, in case of the misappropriation or unlawful conversion of personal property."

The rule as announced in the above cited cases is too well established in this state to require citation from other states to support it. It is well stated, however, in Texas & P. Ry. Co. v. Abilene Cotton Oil Co. 204 U. S. 426, 437, 7 Sup. Ct. 350, 354, 51 L. ed. 553, 9 Ann. Cas. 1075, in connection with a question closely analogous to the one before us:

"We concede," said Mr. Justice White, in entering upon the discussion of the effect of the Interstate Commerce Act upon a shipper's common law right of action grounded upon unreasonableness of rates, "that we must be guided by the principle that repeals by implication are not favored, and indeed that a statute will not be construed as tak-

1 [133 N. W. 804.]

ing away a common law right existing at the date of its enactment, unless that result is imperatively required; that is to say, unless it be found that the pre-existing right is so repugnant to the statute that the survival of such right would in effect deprive the subsequent statute of its efficacy; in other words, render its provisions nugatory."

With this rule in mind, let us then again refer to our statutes, cited above. As originally enacted they were obviously aimed at two distinct evils, namely: excessiveness in rates and discrimination therein as between different persons and localities; and in order to reach them both it was provided, sometimes in the same act, that rates must be both reasonable and equal. In the course of years, however, the statutes intended to stamp out the one began to draw apart from those relating to the other, until now, with the exception of Laws 1911, pp. 70, 104, cc. 50, 87, they fall into two general classes, the one dealing with the maximum charges allowable and with the establishment of fixed rates that shall be deemed reasonable, and the other denouncing departure from the fixed rates in particular cases, as distinguished from a change in such rates, as being an unlawful discrimination. Under the former the duties of the railroad and warehouse commission, the requirements imposed upon the carriers, and the procedure prescribed for the enforcement thereof, all look to the establishment and maintenance of rates that are reasonable and to the prevention of extortion by an upward departure therefrom; while under the latter the aim is clearly and exclusively to prevent unjust discrimination by any variance whatever in particular cases from the established rates. In the former, furthermore, we find a complete and comprehensive act relating to reasonableness of rates, even including a remedy to the shipper from whom rates in excess of those fixed by law are exacted, and in the acts of 1911 we have comprehensive provisions for readjustment of established rates that shall have been found to be either excessive or discriminatory; but, in the acts directed at discrimination in particular cases by departure, either way, from the established rates, we find merely an inhibition and a criminal penalty, but no civil remedy to the disfavored shipper whatever, and we find no reference to the subject of civil remedies for dis-

crimination, either for or against the existence of the same, in any of our statutes. It would seem clear, therefor, that, unless such conclusion be negatived by certain considerations with which we will close this opinion, a shipper's common-law remedy for discrimination still obtains in this state, whatever may be the effect of our statutes upon his former remedy for extortion by exaction of unreasonable or excessive rates. One would have to be oblivious to the course of events to assume that the legislature, though evidently fully realizing the evils of both excessiveness and discrimination in rates and prohibiting both under heavy penalty, intended to leave the individual shipper remediless in the latter case by depriving him of his theretofore existing remedy; and we affirm that no case can be found in the books declaring any such doctrine under similar circumstances.

Coming then to the second phase of the question stated, and again passing for the moment the matter finally to be considered as above indicated, and, further assuming, for the purposes of discussion, that there was no common-law duty of equality in rates and that the statutes prescribing the same impose a new obligation upon the carrier, it is still clear, we think, that a shipper who has been discriminated against has a right of action for damages therefor. It is settled in this state that where a new obligation is imposed by statute, and no civil remedy is provided for its violation, a person of the class for whose benefit or protection the duty is imposed, as distinguished from the general public, may invoke the appropriate common-law right of action. See Merz v. County of Wright, supra; U. S. & Canada Land Co. v. Sullivan, 113 Minn. 27, 32, 128 N. W. 1112, Ann. Cas. 1912A, 51; Baxter v. Coughlin, 70 Minn. 1, 4, 72 N. W. 797; Bott v. Pratt, 33 Minn. 323, 326, 23 N. W. 237, 53 Am. Rep. 47; McCarthy v. City of St. Paul, 22 Minn. 527, 529. And this rule applies even though the statute imposes a criminal penalty for the violation of the obligation so imposed. See Bott v. Pratt, supra; Baxter v. Coughlin, supra.

But we are met with the contention, which is the matter finally to be discussed as above indicated, that, because our railroad and warehouse commission was authorized by statute to and did fix the rate here involved, "to grant plaintiffs the relief sought in this action

would be, in effect, compelling defendant to do a second illegal act to favor plaintiffs, because it had, by an alleged illegal act previously favored some other person or concern." In other words, it is argued that, if the plaintiffs be allowed to recover the difference in the rates in question, it would defeat the purpose of the commission and give the plaintiffs carriage at less than the fixed rate, thus virtually requiring a violation of the law. In elaboration of this position, the defendant contends that a recovery in this action would constitute a second wrong, if the acts complained of may be deemed illegal, and further that such a recovery would in effect fix a lesser rate than that established by law. But, unless we have erred in the analysis which we have already made of our statutes, this contention cannot stand.

Only one wrong is here and can be involved, and that is the discrimination, and it is counterfeit logic to assert that the restoration of the equality of rates commanded by the law and the statutes by recovery of the difference involved in the discrimination, is in any true sense a fixing of a rate or an interference with one previously established. How can an action for damages instituted and tried after the completion of the shipments involved and the full payment of the charges fixed by law be deemed to be an interference with the established rates? The legal rates remain the same, regardless of the infraction of the law complained of, and can in no way be affected by the final outcome of this action; and a judicial readjustment of matters between the parties hereto by an allowance of the most obvious damages which the plaintiffs have suffered from the defendant's violation of the law, cannot be held to be a wrong. The main purpose of the common-law rule and the statutory inhibition against discrimination is thus accomplished, while the legal rates before and during and after the wrong sued for are unaffected.

The contention under consideration is based entirely upon the fact that the rates charged the plaintiffs were fixed by statute and lawful; but, as under our statutes the state has merely become the arbiter between the carrier and the shipper as to the reasonableness of rates, there is no substantial reason why a recovery should not be allowed for discrimination the same as would unquestionably be proper

if the carrier, instead of the state, had fixed the rates. A different conclusion would be squarely in conflict with the construction placed by the Federal courts upon section 8 of the interstate commerce act, as to the damages recoverable for discrimination (see Pennsylvania R. Co. v. International Coal Min. Co.), and likewise would brand as self contradictory the statutes of other states which expressly measure the damages for discrimination involved in departure from legally-established rates, by the difference between the legal rates and those accepted from the illegally favored shipper. See Scofield v. Railroad, supra. In short, this action is not to compel the defendant, as it claims, to do a second illegal act, but to compel it to suffer the consequence of its wrongful and unlawful discrimination against the plaintiffs. See Samuels v. Louisville & N. R. Co. supra, 60.

The common-law rule against discrimination was not for the benefit or protection of the carrier, nor were our rate-regulating statutes enacted for any such purpose; both are based upon the public character of the services rendered by the carrier and the policy that all such service should be equal; and if at times it may be said that the remedies afforded by either are drastic, it is sufficient to answer that they had their inception and found their necessity in the unequal practices of these quasi-public servants when left to follow their own and unrestrained will. Both the common law and the statutes, therefore, must be deemed to be primarily for the protection of shippers, and not to prevent the depletion of the treasuries of the carriers by either secret or open violations of the rules concerning rates.

It is a matter of common knowledge that ordinarily railroads are under the management of experienced and capable men, well qualified to look after the interests of their roads, and that, in a free and open struggle between shippers and carriers, the former have almost invariably been the losers, a result largely due to the advantage derived by the latter from their control of transportation facilities, and their public franchises. It is also commonly known that every advance of the common law in its effort to protect the shippers, and every step taken by the legislatures to establish equality of rates, have been opposed and contested by railroad managers. And now that the doctrine of uniformity has finally become unassailably established, should

any court say that a carrier may still discriminate in the matter of rates, thus building up the business of its friends and ruining that of others, and yet the victim of the discrimination be remediless save by resort to the criminal laws, which in most cases would not save him from the disastrous consequences of the wrong against him, or by suit for damages after his business has been ruined, even then, perhaps, to be met with the contention that he has forfeited his right to relief by not bringing his action before such consequences resulted.

We hold that the modern common-law doctrine prohibits all discrimination in tolls as above declared, and that thereunder, and also by virtue of our statutes, the disfavored shipper has a right of action for damages at least to the extent of the discrimination. No hardship upon the carrier is thus entailed. Compliance with the law and the statutes will avoid the consequences indicated.

Order reversed.