MAIN REALTY COMPANY *vs.* BLACKSTONE VALLEY GAS & ELECTRIC COMPANY.

JULY 31, 1937.

PRESENT: Flynn, C. J., Moss, Capotosto and Condon, JJ.

FLYNN, C. J. This is an action of the case brought, under the provisions of general laws 1923, chapter 253, sec. 43, to recover damages for alleged undue and unreasonable discrimination against the plaintiff by the defendant, a public service corporation. After a trial in the superior court without a jury, a decision was rendered in favor of the plaintiff for $13,530.54, and the case is now before us on the defendant's exception to this decision and various exceptions to rulings by the superior court before and during the trial.

The main features of the case are as follows. The plaintiff was the owner of a large building in the city of Pawtucket in this state and within the territory served by the defendant and was a customer of the defendant for electricity. It let the space in this building to some thirty tenants, wholly or mainly for manufacturing purposes. Each of these tenants was a customer of the defendant for electricity.

On March 7, 1931, the plaintiff made a written request to the defendant relative to being billed for all electrical energy to be furnished to its Goff Mill property through a master meter. After holding the request for eleven weeks, the defendant refused by letter of May 21, 1931, as follows:

"On account of this Company's policy and regulations, which it is believed are for the best interests of electric users in Pawtucket, we cannot sell you electricity for resale to tenants in your building, known as the Goff Mill. We are reluctant to refuse your request in this matter for our interests are parallel with yours in the desire to keep your building filled with good tenants. Unfortunately, however, such circumstances as the recent decision of the Supreme Court in connection with the New Jersey sub-metering case confirms our feeling that we are following the course

which public policy directs. In most cities the practice of sub-metering is not allowed or it is being withdrawn."

On May 11, 1932 the plaintiff made a similar request to the defendant, which was refused by the defendant thirteen days later by letter of May 24, for the reason that "Much as we would like to grant your request in this matter, we do not feel that the resale of electricity is of general advantage to our customers, and consequently we cannot deviate from our rules."

On November 18, 1932, the request was again renewed and, after conferences on the subject, was again refused by the defendant by letter of February 11, 1933, saying: "It is with a good deal of regret that I am compelled to say that I do not see any way in which our terms and conditions as filed with the Public Utilities Commission offer any loophole through which we could arrange for you to have sub-metering and resale of electricity in your Pawtucket building."

The plaintiff claims that, for some years previous to its first request, the defendant had been furnishing several competitors of the plaintiff, by contract with them and through master meters, with electricity to be sold by them to their respective tenants, substantially as requested by the plaintiff, and that these contracts were not terminated by the defendant with reasonable diligence after the plaintiff's request, as they might have been by their terms, but were continued until long after the plaintiff's first request; that substantially similar arrangements were made by the defendant with two other customers after that request; and that two at least of the defendant's customers continued to enjoy such privilege after July 1, 1932, when a proposed new rule, as filed by the defendant itself with the public utilities commission, was to become effective against sub-metering or reselling by any customer; and that one of these customers was given such preference even after October 4, 1933, when the present action was begun.

The plaintiff claims also that, because of the service supplied by the defendant under these contracts and their unreasonable continuance after the refusal of the plaintiff's requests for the same kind of service, it was subjected to an "undue or unreasonable prejudice or disadvantage in any respect whatsoever" within the meaning of G. L. 1923, chap. 253, sec. 40, and was entitled thereby to maintain this action under sec. 43 of the same chapter.

The defendant claims that these arrangements were substantially different from what the plaintiff requested for itself, were justified by the special circumstances under which they were entered into, and were not inconsistent with its refusal of the plaintiff's request.

All the counts of the amended declaration base the plaintiff's right to recover specifically and squarely on the statute. G. L. 1923, chap. 253, secs. 40, 43. These sections provide as follows: "Sec. 40. If any public utility shall make or give any undue or unreasonable preference or advantage to any particular person, firm, or corporation, or shall subject any particular person, firm, or corporation to any undue or unreasonable prejudice or disadvantage in any respect whatsoever, such public utility shall be deemed guilty of a misdemeanor and upon conviction thereof shall be fined not less than two hundred dollars nor more than five hundred dollars for each offense."

"Sec. 43. If any public utility shall do or cause to be done or permit to be done any matter, act or thing in this chapter prohibited or declared to be unlawful, or shall omit to do any act, matter or thing to be done by it, such public utility shall be liable to the person, firm, or corporation injured thereby, in an action of the case, to be brought within three years from the time the cause of action accrues and not after, for the amount of damage sustained in consequence of such violation: *Provided*, that any recovery as in this section provided shall in no manner affect the recovery by the state of the penalty prescribed for such violation."

The first count of the plaintiff's amended declaration sets out, in paragraph "Third", the plaintiff's following claim: "That during said period the defendant subjected the plaintiff to an undue and unreasonable prejudice and disadvantage contrary to Section 40 and 43 of Chapter 253 of General Laws of Rhode Island, 1923, in that

"(a) Although during said period, the defendant furnished competitors of the plaintiff, to wit, landlords of various other buildings in said Pawtucket and the City of Central Falls who were engaged, as was the plaintiff as aforesaid, in letting and leasing spaces therein to various persons, firms, or corporations, all of which were substantial users of electricity all or a substantial part of the electricity which the said defendant furnished for use in said buildings, through a master meter, that is to say, the aforesaid lessors bought all, or a substantial part of the electricity furnished by the defendant as aforesaid through a master meter; and because of the amount of electricity used were able to and did buy at a lower rate than said lessors and their various tenants could have bought, if said electricity had been separately metered to said lessors and their various tenants, and that said lessors by buying at this low rate submetered and sold said electricity to their various tenants at a profit, although the said lessors sold said electricity to their said various tenants at the same or a lower rate than said various tenants could buy electricity from the said defendant, if the said defendant had separately metered said electricity to the said various tenants.

"(b) And although on or about the first day of March, 1931, and at various times subsequent thereto during said period, the plaintiff requested the defendant to furnish it with a master meter as the said defendant had furnished as aforesaid said other landlords in said Pawtucket and Central Falls who were engaged as was the plaintiff in letting and leasing space in their buildings as aforesaid, in order that the plaintiff could submeter and sell said electricity to its various tenants at a profit in the same manner as the aforesaid

other landlords in said Pawtucket and Central Falls were able to do. Yet, the defendant refused to comply with the plaintiff's requests to furnish it with a master meter as aforesaid but insisted on furnishing electricity separately metered to the plaintiff and to each of the said plaintiff's various tenants." In the next paragraph follows the allegation of damage to the plaintiff because of being subjected to such undue and unreasonable prejudice and disadvantage.

The second count thereof is substantially the same in structure as the first count, but it also adds a further detail of how the privilege of such service could and did operate to give a preference and advantage to the other landlords, as competitors of the plaintiff, and how the refusal to give the same service to the plaintiff subjected the latter to undue and unreasonable prejudice and disadvantage, to its damage.

The third and fourth counts of the amended declaration also specifically base the plaintiff's complaint and right to recover on the provisions of chapter 253. The language used in these counts is calculated to fit more closely and to follow respectively the two aspects of the provisions of the statute itself, namely, (1) the giving by the defendant of an undue and unreasonable preference and advantage to the plaintiff's competitors, contrary to secs. 40 and 43 of said chapter, and (2) the subjecting of the plaintiff to any undue and unreasonable prejudice and disadvantage in any respect whatsoever, contrary to said sections, while denying during the same period the plaintiff's requests for the substantially same service granted by the defendant to the plaintiff's competitors. Both of these counts further set out in considerable detail the use which could be and was made by these competitors of such master-metered service, and also the plaintiff's requests to have the use of this service *in the same manner* as did its competitors, and the particulars of the preference granted to the competitors and the prejudice to which the plaintiff was subjected to its damage under the statute.

At the beginning of the trial, at the end of the plaintiff's case and at the time of the final argument in the superior court, the defendant moved to dismiss the case on the ground that it was an administrative matter over which the state division of public utilities had primary jurisdiction. The motions were denied and exceptions were taken by the defendant.

The three principal issues in the case are: (1) Was the plaintiff subjected by the defendant to any undue or unreasonable prejudice or disadvantage in any respect whatsoever, or was any undue or unreasonable preference or advantage made or given by the defendant to any of its other customers? (2) If so, did the plaintiff prove any recoverable damages? (3) Was the trial court without jurisdiction of the case because the state division of public utilities had primary jurisdiction of the matters involved?

The last issue, being jurisdictional, will be first disposed of. The first part of the defendant's contention on this point is phrased by its counsel, in their brief, as follows: "We take it to be clearly established on the one hand that a charge against a utility that either a rate or a practice is unreasonable or discriminatory requires a preliminary application to the Commission to determine the question of whether such rate or practice is in fact unfair or unreasonable. On the other hand we have the cases cited by the trial court which hold that where a company has clearly departed from an *established rule or rate* the question raised becomes one of fact with respect to which prior application to the administrative tribunal is not required."

Counsel then contend that the present controversy, because of the nature of the issues involved, comes under the former and not under the latter of these two rules. They therefore conclude that the trial court had no jurisdiction over this case, because the case had not been first presented to the division of public utilities and no decision thereon had been obtained from that body.

We are of the opinion that the conclusion cannot stand, for the reason, among others, that there is not in force in this state, with regard to the public utilities which are under the jurisdiction of the state "division of public utilities", the successor of the "public utilities commission", any such doctrine as is set forth in the above quotation from the defendant's brief.

There appears to be such a doctrine, established by a series of cases in the Supreme Court of the United States, as to the interstate railroads under the jurisdiction of the interstate commerce commission, and known as the doctrine of "primary jurisdiction." A number of these cases have been cited for the defendant and are discussed in its brief.

An examination of the opinions in these cited cases has convinced us that the federal rule was adopted by construing the Interstate Commerce Act in the light of the urgent necessities of the situation and of the fact that the act itself, U. S. Code, Title 49, section 1, in § 9, provides, in substance, that any person claiming to be damaged by any common carrier that is subject to the provisions of the act may either make complaint to the commission or bring suit in his own behalf for the recovery of the damages for which such common carrier may be liable under such provisions, in any district court of the United States of competent jurisdiction; but must elect between the two methods of procedure.

This provision, that a person claiming to be damaged by any unlawful discrimination by any such carrier may, if he choose, bring a proceeding before the commission to recover his damages, is substantially the only express language in the act which the supreme court relied upon in adopting the above doctrine. It is noteworthy that there is no such provision in the Rhode Island legislation for the regulation of public utilities and that an action thereunder for damages is not only *permitted* to be brought in a court of this state, but it is the *only* remedy provided for the recovery of damages.

The doctrine in question was apparently first promulgated as to transportation rates and seems to have been first laid down in *Texas & Pacific Ry. Co.* v. *Abilene Cotton Oil Co.,* 204 U. S. 426. There it was rested, aside from the minor stress laid upon the above-mentioned express language of the Interstate Commerce Act, almost entirely on the general scope and purpose of the act, namely, the establishment and maintenance, *throughout the country,* of a harmonious system of reasonable rates in interstate commerce, without unjust discrimination.

This doctrine was later held, for obvious reasons, to apply to established regulations, practices and the like, and its limits were defined. *Baltimore & Ohio R. R. Co.* v. *United States, ex rel. Pitcairn Coal Co.,* 215 U. S. 481; *Morrisdale Coal Co.* v. *Pennsylvania R. R. Co.,* 230 U. S. 304; *Midland Valley R. R. Co.* v. *Barkley,* 276 U. S. 482; *Pennsylvania R. R. Co.* v. *Puritan Coal Mining Co.,* 237 U. S. 121.

In our opinion there is no good reason for construing the public utilities act in this state as the Interstate Commerce Act has been construed. Under the latter act, if actions requiring the determination of the reasonableness of established rates, regulations, practices and the like, could be brought in the district courts of the United States, the same questions might be decided differently in many different parts of the country and the result might be chaos. Such a result would defeat the obvious purpose of that act. But under the law of this state there would be no such difficulty, and the statute here should therefore be construed in accordance with its *express* language. Under the Interstate Commerce Act, the *commission* has the power to award damages which is *not* the case under our statute. Moreover, in the provision for the recovery of damages under our statute, an action of the case is made the *exclusive* remedy and there is nothing in the statute to make that remedy in any case conditional upon previous recourse to the commission.

Even if our statute were more like the I. C. A., it is noteworthy that, in cases under that act, wherein the doctrine

of primary jurisdiction has been invoked or discussed, the United States Supreme Court apparently has recognized the necessary distinction, which fits the facts of the instant case. In the comparatively recent case of *Baltimore & Ohio R. Co. v. Brady,* 288 U. S. 448, at page 457, the opinion says: "But if the rule, regulation or practice of the carrier is not attacked and the shipper's claim is grounded upon its violation or discriminatory enforcement, there is no administrative question involved. In such cases the court is required merely to decide whether the carrier has departed from its established standard. The decision does not concern the reasonableness or validity of the rule itself and it has no tendency against uniformity or other purpose of the Act. Suits for damages upon such grounds may be prosecuted without action or finding by the Commission. *Penna R. Co. v. Puritan Coal Co.,* 237 U. S. 121, 131-134. *Ill. Cent. R. Co. v. Mulberry Coal Co.,* 238 U. S. 275, 282-283. *Penna R. Co. v. Sonman Coal Co.,* 242 U. S. 120, 124."

In the instant case the plaintiff is not attacking the reasonableness or validity of the rule or practice of the defendant in giving service through master meters. It charges either a violation or discrimination in the enforcement of that rule or practice.

Defendant's counsel seems to admit the soundness and effect of the *Brady* case, *supra,* when he says in his brief: "If the question submitted to the Court in the case at bar had been: Did the defendant violate one of its own express rules and give the plaintiff's competitor under that rule exactly the same thing which it refused to give the plaintiff? we could not quarrel with an assumption of jurisdiction by the Court . . . ."

He thus would base his case largely on the contention that the service requested by the plaintiff was not the same as that given to its competitors. But the trial justice found on the evidence that they were substantially the same.

In view of these cases and the peculiar features of this chapter and the obvious and vital differences between it

and the Interstate Commerce Act, we find that the doctrine of "primary jurisdiction" is not applicable here and that the trial justice did not err in refusing to dismiss the present action on the basis of that doctrine.

The next question to be considered is substantially whether the plaintiff was subjected by the defendant "to any undue and unreasonable prejudice or disadvantage in any respect whatsoever." The defendant contracted or arranged to supply, and did supply, to five customers who were competitors of the plaintiff, a certain kind of electrical service, which the plaintiff contends was substantially the same as that which it requested several times and which the defendant denied to it. The following facts, among others, concerning three of these instances of alleged discrimination appear from the evidence.

On September 1, 1925, the defendant granted to the Royal Realty Company a contract for electric master-metered service for the latter's building, located in the general neighborhood of the plaintiff's building and within the territory served by the defendant. This contract was to run for three years from that date, and thereafter from year to year, unless terminated by breach or by one year's notice. The defendant, as provided by this contract, continued to supply electric power and light, through such master-metered service, to this company until September 1, 1932, when it was terminated. The electricity used by this company for its building was measured by a master meter and was billed to and paid by that company at wholesale or quantity rates. It was remetered and resold as electricity to the tenants by the company which collected payment therefor.

On October 19, 1928, the defendant granted to the Trades Building, Inc. a contract for electric master-metered service for the Trades Building, so-called, owned by the latter, which was located in the immediate vicinity of the plaintiff's building and was used generally for the same purposes as was the plaintiff's building. The Trades Build-

ing, however, was connected with water power, which provided part of the electricity used by the company and its tenants; but this difference is not material, in our opinion, since it affects merely the amount of electricity to be required from the defendant and not the *kind of service* which the defendant supplied. This contract was to run until November 1, 1931 and thereafter from year to year unless terminated by breach or by one year's notice. Notwithstanding these latter provisions, the defendant did not terminate the contract on November 1, 1931, and gave no notice at that time to Trades Building, Inc. to terminate it. On the contrary, it continued to supply electric power and light through the same master-metered service, until the end of 1934; and this in spite of the fact that the defendant had filed with the public utilities commission, on May 27, 1932 to be effective July 1, 1932, its own rule by which no customers were permitted to remeter or resell to their tenants any electricity furnished by the defendant. (See R. I. P. U. C. No. 155) All the electricity supplied to this building by the defendant was paid for by the landlord at the defendant's wholesale or quantity rate. The defendant was aware that the landlord intended to and did remeter and resell such electricity to its tenants.

The third instance of the defendant's dealings related to the Special Realty Corporation whose building was also situated in the vicinity of the plaintiff's building. At the end of 1931, or the beginning of 1932, the defendant denied a request of this company for electric master-metered service. This corporation had just combined three separate buildings into a composite building, with some six stores on the ground floor and offices on all of the floors above. All the tenants then received electricity directly from the defendant. But in April 1932 a special arrangement was made with that corporation as to the stores on the ground floor, the tenants on the floor above continuing to be directly connected as before. The plaintiff's building also had several stores on the ground floor as did this customer.

Under this special arrangement, *one* meter was installed by the defendant through which passed all the electricity used by certain tenants of the stores, and this was billed to and paid for at quantity rates by the company which owned the building. The company then collected for the electricity used by the tenants. The defendant permitted *check meters* to be installed in several instances for certain periods, in order to enable the owner to determine how much electricity was being used by the various tenants, and to provide a measured basis on which to estimate the monthly bills to be sent to the tenants for electricity used by them and sold to them by the Special Realty Company. Although it appeared on each rent bill, the charge for electricity used by each tenant was made specifically as a *separate item for electricity* and not as any part of the rent, *as such*. This charge for electricity was figured on the basis of measurements by the check meters, temporarily installed by the defendant. It appears, however, that check meters were later used much more extensively by the landlord to actually measure the tenants' use of electricity. The defendant, however, denied knowledge of their later and extensive use by the landlord.

There was also evidence of some details, connected with the service in question upon which the defendant strongly urged the trial justice to make certain factual distinctions between the service supplied by the defendant to these competitors and that which was, during the same period, requested by and denied to the plaintiff by the defendant. The trial justice, however, considered such distinctions as being differences merely *in degree* and not *in essence* or *in kind of service*. We agree with his conclusion in this respect.

The defendant also urges that there were exceptional circumstances which justified the defendant's grant of the preference and advantage to three above-mentioned customers, while refusing the same to the plaintiff. Solely from the business viewpoint of the defendant itself, this may be quite true; but from the viewpoint of better ac-

complishing the general and particular purposes of the statute, as we understand them, the defendant's contention in this regard is not, on the record and evidence here, available as an adequate defense to this action.

The trial justice found from all the evidence that (1) the electric master-metered service requested by the plaintiff was substantially the same as that which the defendant granted to the plaintiff's competitors, who owned and rented space in buildings located in the same neighborhood and within the territory served by the defendant; (2) that arrangements for such service to the above-mentioned three customers, and its continuance by the defendant so as to give them the advantage of remetering and reselling electricity to their tenants, was inconsistent with the defendant's refusal, during the same period, to grant the same kind of service to the plaintiff, as requested; (3) that the defendant did not cancel the contracts or service granted to these competitors of the plaintiff with reasonable diligence, after receiving and denying the latter's request for similiar service, nor did it withdraw such service from *all* customers with reasonable diligence thereafter; (4) that these competitors, through this service and with the defendant's knowledge and permission, resold electricity to their tenants; (5) that the owners then billed the tenants for the electricity used by the latter as a *separate item* for *electricity,* and *not* as an integral and inseparable part of the rent, *as such,* or for electrically equipped space; and (6) that the defendant had, by its tortious conduct, subjected the plaintiff to undue and unreasonable prejudice and disadvantage, which entitled it to bring an action under the statute to recover its damages.

In reaching his conclusions, the trial justice had the benefit of seeing and hearing the witnesses. He also was entitled to consider all the evidence and to draw therefrom such inferences as were reasonable and proper under the circumstances, even though another different inference, equally reasonable, might also be drawn therefrom. Upon

a consideration of all the evidence and circumstances here presented, we cannot say that the findings of fact or the decision of the trial justice on this phase of the case are entirely without support in the evidence, or that his decision on this issue is clearly erroneous.

The plaintiff further sought to establish by evidence that the defendant granted the same substantial service to other customers, namely, Arnold Realty Co. and Kahn Silk Mills, so designated in the briefs. The trial justice, however, ruled that the arrangements with these customers did not fall within the allegations of the plaintiff's amended declaration. Therefore, and in view of our above conclusions, we need not further discuss them.

On the application of the law, as gathered from numerous citations presented by the defendant, it should be carefully noted that we are not concerned here with a case "where the issue was whether the defendant was to be compelled contrary to its own policy *and* against the order of the public utilities commission to sell at wholesale rates current to be remetered and resold at retail to the ultimate consumers by either the landlord or its agents", (see *The Sixty Seven South Munn, Inc.* v. *Board of Public Utilities Commissioners,* 106 N. J. L. 45); nor where the case is before us on appeal from some ruling or regulation made by the public utilities commission which raises a question of the unreasonable or arbitrary exercise of the commission's discretionary or other powers; nor where the plaintiff is asking for a rate which differs from the defendant's established schedule of rates, as filed with and approved by the public utilities commission; nor where the plaintiff is asking for an *illegal* rebate or for a lower rate *illegally* granted to others; nor where the preference requested by plaintiff was *uniformly* denied to other persons or firms in like circumstances; nor where the plaintiff seeks an *illegal* advantage or service. As a matter of fact, both the plaintiff and defendant consistently assert that the service granted to the plaintiff's competitors was not contrary to the law or to any

rule or regulation made or duly approved and promulgated by the public utilities commission.

The general but substantial differences between the facts of the instant case and the facts, provisions of the different statutes, and the procedure involved in the many federal rate cases cited, and chiefly relied on by the defendant upon this point, makes it unnecessary to discuss these cases in detail. In our opinion, they fall into some of the above classifications, are not in point on the facts, and are not therefore controlling upon the issues of this case. In the last analysis, the plaintiff's right of action is given, and must be determined, by the specific provisions of our own statute.

Moreover, in our view of the record and issues as presented to the trial court and before us, we are not now concerned with the question whether the privilege to landlords of buying electricity at quantity rates, and of reselling the same to their tenants by remetering or its substantial equivalent is consistent with a wise and sound public policy. Generally speaking, the definition of what is wise or sound as a public policy in the statutory regulation of utilities is a matter to be determined, within constitutional limitations, primarily by the legislative branch of the government and not by the court. In the absence of any declaration in this statute prohibiting such service or practice, either expressly or by necessary inference, or of any rule or regulation duly promulgated by the public utilities commission prohibiting such service, and upon our view of the evidence and law governing the instant case, this question is not properly before us for determination.

The defendant has prosecuted many exceptions to rulings of the trial court with respect to evidentiary matters relating to the defendant's alleged discrimination against the plaintiff and the defendant's liability, and also to some extent relating to damages, which question will be considered presently. Most of these exceptions relate to the allowance of evidence in connection with the Trades Building, concerning which counsel for the defendant in his brief

says: "We do not now urge any of the formal objections originally made to any of these matters. We call attention to them primarily for the purpose of making it clear that if the court finds, as we feel it must, that the Trades Building situation is not analogous on its underlying facts, it should sustain these exceptions as well as the general exception to the decision."

Others of these exceptions relate largely to the existence of discrimination in general or in some of the particular instances already discussed in connection with the plaintiff's competitors. These also are treated very sketchily and summarily in the defendant's brief, as are those relating to the Trades Building, and no citation of authority bearing upon any of them has been submitted.

All of these alleged errors relating to evidentiary matters were made possible, according to the defendant's contention, because of the alleged underlying errors in the decision of the trial justice on the points upon which they are based, which we have already discussed. These contentions, however, ignore the presence of evidence and the findings of the trial justice on the facts, adversely to the defendant, that the service requested by the plaintiff was substantially the same as that which was granted to the plaintiff's competitors, that the defendant did not cancel or withdraw such services with due diligence after receiving the plaintiff's request, and that there was unreasonable discrimination, contrary to the statute, by the defendant against the plaintiff in denying it the same service that was being granted to others. The defendant has failed to convince us that the exceptions in question should be sustained.

The defendant has prosecuted and treated in a similar brief manner, a group of exceptions which relate to the question of damages, and says of them: "We have preserved all of these exceptions because they were all based on the underlying ground that, no discrimination having been shown, proof with respect to damages arising therefrom was inadmissible." Apparently there would be no objection

if discrimination were shown. In view of the finding of the trial justice, based upon the weight of credible evidence, that unreasonable discrimination against the plaintiff was proved, as well as other facts, upon which these alleged errors are based, and in the absence of any citation of authority in support of its particular contentions, we are of the opinion that all of the defendant's exceptions to the rulings of the trial justice on evidentiary matters should be overruled.

This brings us to the next question, namely whether the plaintiff proved any recoverable damages. The trial justice found upon the evidence that the defendant, by denying to the plaintiff the facility or service of a master meter and the right to resell electricity. to its tenants, in the same manner that such service and right were granted to the plaintiff's competitors, deprived the plaintiff of the opportunity to make certain profits on such resale; that is, he held substantially that the plaintiff was damaged by the wrongful act of the defendant to the extent of gains which the plaintiff would have naturally and probably acquired had the defendant not subjected it to undue and unreasonable prejudice or disadvantage contrary to the statute.

The plaintiff introduced, among other things, testimony and evidence showing the amount of electricity billed by the defendant to the tenants of the plaintiff over the period from April 1, 1931 to September 19, 1933, and the cost to the plaintiff of the same amount of electricity, based on legally. established rates, had the defendant furnished to the plaintiff this master-metered service. The trial justice found that, broadly speaking, the difference between the total of charges for electricity made by the defendant to the tenants of the plaintiff over that period, and the cost of that amount of electricity, if it had been billed to the plaintiff according to such master-metered service at wholesale rates, as enjoyed by plaintiff's competitors, plus interest charges over the whole period mentioned, was what the

plaintiff claimed by way of damages, which it called "lost profits".

A detailed statement, among other things, of the plaintiff's claim of damages was introduced in evidence and the trial justice found that the items therein were supported by competent and credible evidence. This schedule, in general, computes in a summarized form, damages claimed by the plaintiff from such loss of profits as referred to above, as follows. "Gross Profits", that is, the difference between the aggregate of the defendant's billings to various tenants of the plaintiff for electricity at retail, less cash discount, over the period from April 1, 1931 to September 19, 1933, and the aggregate charges to the plaintiff for such electricity at wholesale, less cash discount, if furnished through one meter as requested, was $14,633.86. To this was added interest at the rate of six per cent per annum on the net monthly computations of profit over substantially this period in the sum of $1,019.34, making a total of "gross profits and interest" of $15,653.20.

From this amount, certain deductions for substation expenses, bad debts, and expenses of the master-metered service, in the amount of $3,352.71, were allowed in favor of the defendant without substantial dispute, and were deducted from the above item of $15,653.20, leaving a balance of net lost profits of $12,300.49, which was the basic finding of the trial justice on the question of damages. To this last total was added interest at the rate of 6% per annum under the law from the date of the writ to the date of the decision, namely, $1230.05, making the total of $13,530.54, which is the total amount of the decision as rendered by the trial justice in favor of the plaintiff.

The defendant contends that the plaintiff is not entitled, as a matter of law, to damages figured on this basis. It relies on a ruling laid down in *Pennsylvania R. Co.* v. *International Coal Mining Co.*, 230 U. S. 184, and subsequent cases, and in particular the case of *Interstate Commerce Commission* v. *United States*, 289 U. S. 385. The *Interna-*

*tional Coal Mining Co.* case, *supra,* involves basically a request for the granting by a carrier of an illegal rebate to a shipper. In the instant case the plaintiff is not asking for any *illegal* rebate or service, and the doctrine of damages in the former case is therefore not applicable here. The *Interstate Commerce Commission* case, *supra,* apart from *dicta,* stands for the proposition that *mandamus* was not appropriate to compel the interstate commerce commission to make an award and reparation in a particular way, where the ruling of the commission, within its judicial or discretionary power, was not unreasonable or arbitrary and that *mandamus* could not be substituted for a writ of error or appeal. As previously indicated, these and other federal rate cases are clearly distinguishable in various respects from and are not applicable to the facts of the instant case.

The defendant also contends that the damages claimed are speculative in character, and seeks to invoke the so-called "new business" rule to the effect that where the business is new, mere expected or estimated profits cannot be recovered as damages. The facts in the instant case disclose an established business and a fixed consumption of electricity by the plaintiff's tenants and they can not reasonably be considered under such "new business", so as to be brought under that rule, as we understand its meaning and scope.

The statute here gives the plaintiff the right to an action of tort for damages. Ordinarily in such an action damages include the natural and probable consequences of the wrong committed. Allowance of loss of profits, as an element of damage for the commission of a tort, when such are not excluded as being unnatural or remote, is held to be a question of the certainty of proof. 1 Sedgwick on Damages, (9th ed.) § 174. In section 177 of the above text, the author states: "The general rule is, then, that a plaintiff may recover compensation for any gain which he can make it appear with reasonable certainty the defendant's wrongful act prevented him from acquiring; subject, of course, to

the general principles as to remoteness, compensation, etc. already stated."

In *Simmons* v. *Brown*, 5 R. I. 299, which was an action of the case, loss of profits when properly established and not too remote or speculative was recognized as a proper basis to establish the plaintiff's damages, evidently in accordance with the general principles and rule above enunciated.

In cases of tort arising from discrimination by public utilities in the furnishing of service or facilities, the same general principles have been applied according to the decisions summarized at 10 C. J. 505, where it is said among other things: "All damages which ordinarily and in the natural course of things have resulted from the commission of the wrongful act are recoverable. Loss of profits, if clearly shown and not merely speculative, is an element of damages." To similar effect see *Hillsdale Coal & Coke Co.* v. *Pennsylvania R. Co.*, 78 A. 28; *Minds* v. *Pennsylvania R. Co.*, 228 Pa. 575; *Puritan Coal Mining Co.* v. *Pennsylvania R. Co.*, 85 A. 426; *Pennsylvania R. Co.*, v. *Puritan Coal Mining Co.*, 237 U. S. 121; *Illinois Central R. Co.* v. *Mulberry Hill Coal Co.*, 238 U. S. 275.

Moreover, it has been held substantially that the general damages incident to an unlawful discrimination by a public service corporation against a plaintiff includes the difference between the charges involved in the discrimination, whether viewed according to the English rule, so-called, or deemed to be purely compensatory by way of restoration of substantial equality of service to all competitors in like circumstances. See *Sullivan* v. *Minneapolis & R. R. Ry. Co.*, 121 Minn. 488: *Seaman* v. *Minneapolis & R. R. Ry. Co.*, 127 Minn. 180; *Mitchell Coal & Coke Co.* v. *Pennsylvania R. Co.*, 88 A. 743; *National Radiator Co.* v. *Pennsylvania R. Co.*, 143 A. 85. The above cases apparently treat the essence of the wrong committed by the defendant as being the unlawful discrimination, and the statute as intended, among other things, to prevent such discrimination by a public utility. Therefore, they hold, in substance, that the dam-

ages inevitably incident to such discrimination must include the difference between the amount paid by the customer from whom the full rate is exacted and that accepted by the utility from the more favored competitor.

In the instant case, the chief elements of the plaintiff's loss of profits, upon which proof ordinarily might be lacking in certainty, thereby making such loss too remote or merely speculative, were found by the trial justice to be definitely fixed in the evidence without substantial dispute. The rates for electricity, both retail and wholesale, as charged by the defendant, were fixed under the law and were filed with the public utilities commission or its successor; the amount of electricity, used by tenants of the plaintiff over the period in question, was not open to dispute, being definitely established by the defendant's own meters, measurements and charges; there was testimony that the tenants using most of the entire electric requirements of the plaintiff's building would have taken their supply from the plaintiff, if given that opportunity through the master-metered service, and there was no evidence of any tenant who would have refused to accept such service.

The trial justice ruled that the plaintiff's loss of profits, as claimed, was proved with reasonable certainty and was not too remote or speculative; that, under the existing circumstances, such loss was a natural and probable consequence of the defendant's wrongful denial to the plaintiff of the service to which, by operation of law, the plaintiff was entitled, so long as it was legal and was being granted to the plaintiff's competitors; and that therefore the plaintiff was entitled, under the statute, to recover such loss of profits, as proved, as an element of damages suffered by reason of being subjected to undue and unreasonable prejudice and disadvantage by the defendant's tortious conduct. Such rulings are in accord with the general principals and rules of law to which we have above referred. We therefore find no error in his decision on this point.

The defendant's brief admits that the loss of tenants because of such discrimination would have been a proper damage, if shown, but then proceeds to argue generally upon the assumption that such loss is the *only* proper damage. The plaintiff should not be denied proper damages, which it has proved in accordance with accepted principles and rules of law, simply because it did not also prove a different and further loss. We are of the opinion that the reasoning of the decisions in those cases in the several states, some of which are cited or referred to above, is best suited to carry out the express provisions and the general and particular purposes of our statute as a whole and of sec. 43. If this conclusion seems to impose strict obligations upon a defendant public utility, the simple and adequate answer is that the law itself, not the court, expressly provides it. In this connection it also should be noted that the defendant utility has within its own power at all times the means to prevent or to correct unjust discriminations, so as to avoid liability therefor to the wronged individual under sec. 43. We are of the opinion that to hold otherwise than we do, under our statute and under the circumstances of this case, would pave the way to substantially defeat the expressed intent of the statute, and would bring about, practically speaking in the ordinary case, a situation comparable to the result obtained in the case of *Pennsylvania R. Co.* v. *International Coal Mining Co., supra,* which Pitney, J. characterized as "The result is, the legal paradox: *Injuria sine damno.* The plaintiff is wronged, but not harmed; it may sue, but may not recover."

Two other questions, which affect the amount of damages as awarded by the trial justice, are important here, namely, whether it was error for the trial justice to allow damages for the period subsequent to July 1, 1932, when the defendant's own rule against any submetering, remetering or reselling of electricity by any of its customers was to become effective; and, secondly, whether the allowance of interest at the rate of 6% per annum on the computation of the

monthly "loss of profits", amounting substantially to $1019.34, was erroneous.

The answer to the first of these question, in view of what the trial justice found on the facts and what already has been discussed, depends chiefly on the *legal* effect to be given to the rule, forwarded by letter of the defendant to the public utilities commission on May 27, 1932, to become effective July 1, 1932, and identified in evidence as R. I. P. U. C. No. 155. This letter (plaintiff's exhibit 65) transmitted to said commission for filing a copy of certain "Terms and Conditions—Electric" of the defendant's service in the Pawtucket Division, and purported in the first sentence to be sent as a part of a "number of rates"; but the exhibit itself otherwise shows no real relation to *rates*. Moreover, it does bear plainly upon its face the following explanatory notation: "Issue June 1, 1932. The company's terms and conditions, which incorporate the rules of operation and practices under which service is supplied, are being refiled to incorporate certain revisions and changes necessary to bring them into line with recent practices. These terms and conditions relate to the practices and conditions under which service is supplied and do not result in any change, in the rates or bills as rendered to customers, from those under the previous terms and conditions now on file."

"This new set of terms and conditions", as the defendant's counsel refers to them, was enclosed with the defendant's letter of May 27, 1932, just referred to. (Plaintiff's exhibit 65) The pertinent part of such new terms and conditions, according to his brief, is found in the second subparagraph of paragraph " 9, Metering" and reads: "The company shall undertake to furnish service to the customer for use only for his own purposes and only on the premises occupied through ownership or lease by the customer, and the service shall not be remetered or sub-metered by the customer for resale to another or others. Existing contracts for sub-metered service will not be renewed after November 1, 1932."

(Defendant's exhibit L) This rule was not withdrawn during the period in question.

If the mere filing of this request or new rule by the defendant with the public utilities commission is to be given the same *legal* force and effect as is given to a proper regulation duly promulgated by such commission under the statute, then the plaintiff would have been asking, after July 1, 1932 (the effective date of such rule), for a service which would have been *illegal* for the defendant to grant to it or to any of its other customers. In such instance, the refusal by the defendant to grant the service requested by the plaintiff would not constitute such undue and unreasonable prejudice or disadvantage to the plaintiff as is contemplated in sec. 43 of the statute. Under those circumstances the case, by analogy, might well come within *Pennsylvania R. Co.* v. *International Coal Mining Co., supra,* in which the rule of law laid down in this regard is not disapproved by the plaintiff although distinctions between that case and the instant case were necessarily made upon their peculiar and different facts.

On the other hand, if such mere filing is *not* entitled to be given the same *legal* force and effect, as is given to a proper regulation duly promulgated by such commission under the statute, then the service requested by the plaintiff after July 1, 1932, would *not* have been illegal for the defendant to grant. In such instance, the denial by the defendant to grant to the plaintiff the same substantial service which the defendant continued, during the same period, to grant to the plaintiff's competitors, would subject the plaintiff to undue and unreasonable prejudice and disadvantage as claimed.

The new rule in question seems originally to have been intended for filing with the public utilities commission under sec. 48 of the statute. Counsel for both parties, however, appear now to be in agreement that sec. 48 of this chapter relates solely to schedules of "rates, tolls and charges" which are established by the utility for any service

it renders within the state; and that no changes in such rates, tolls or charges can be made by the utility without first complying with the requirements of this section, including notice to the commission and to the public. According to the evidence, the defendant did not comply with these requirements. Both counsel also seem to agree that R. I. P. U. C. No. 155, the defendant's new rule, deals solely with the *kind of service,* its terms and conditions, and does not in any way relate to or affect any change in any "rates, tolls or charges", as contemplated in sec. 48.

Counsel for both parties, therefore, though for possibly different reasons, appear to agree that R. I. P. U. C. No. 155 was not properly filed or acted upon as a regulation under the provisions of sec. 48. Moreover, the defendant's counsel has pointed out no other section of the statute which authorizes and requires us to give this rule the legal effect of such a regulation, and the plaintiff's counsel asserts that there is none. Furthermore, neither counsel have submitted a case, and we have discovered none, which requires us to give to such a proposed new rule, in the circumstances of this case, the same legal and binding force and effect of a proper regulation of the public utilities commission or a provision of the statute.

Indeed the defendant's counsel appears to argue, in effect, that the defendant utility may change its terms, conditions and regulations of service at any time without giving any notice thereof to the public utilities commission or to the public; that it could file or withdraw such new rule at any time according to its own will without notice or hearing of any kind or any cause being duly shown; and that any such notice which it may choose to give to the public utility commission or to its successor the division of public utilities, as stated in his brief, is "not required by statute but is done simply for the convenience of the division." Whether or not this contention is a sound conception of the law need not concern us in the instant case. We refer to it merely to indicate the inconsistency between the viewpoint of

defendant's counsel in this regard and the defendant's apparent attitude that it could not legally grant the requested service after July 1, 1932, because of the mere filing of its new rule.

Again, if it is the defendant's contention, to avoid a charge of unreasonable discrimination, that this rule, when filed, though not equivalent to a regulation of the commission or of law, nevertheless was binding upon it until withdrawn or otherwise disapproved so, that the defendant was thereby justified, after July 1, 1932, in denying the service requested by the plaintiff, then logic and justice seem to us to require that such rule must be held to be binding upon the defendant to deny such service after July 1, 1932, to *all* customers in substantially similar circumstances. To hold otherwise would seem to invite and approve unjust discrimination and lack of uniformity which the express provisions of sec. 43 and of the statute seek to prevent.

In connection with the above contention, the trial justice found that the weight of the credible evidence supported the conclusion that the service requested by the plaintiff was not illegal for the defendant to grant after July 1, 1932 and that the defendant's continued refusal to grant to the plaintiff such service during the period from July 1, 1932 to September 19, 1933, although continuing to grant substantially the same service to at least one of the plaintiff's competitors for an unreasonable length of time thereafter, was wrongful discrimination and subjected the plaintiff to undue and unreasonable prejudice and disadvantage under the statute.

Incidentally, it is pertinent to note that the defendant continued, after July 1, 1932, to extend a preference to certain of the plaintiff's competitors by way of permitting the latter to submeter and resell electricity to tenants, in plain disregard even of its own rule as filed. In similar circumstances, where the plaintiff seeks damages, not because the rule itself is unreasonable or discriminatory, but because of the unreasonable and discriminatory breach of its

own rule, recovery has been permitted in so-called rate cases. *Pennsylvania R. Co., v. Puritan Coal Mining Co., supra; Illinois Central R. Co. v. Mulberry Hill Coal Co., supra.* See also *Hillsdale Coal & Coke Co. v. Pennsylvania R. Co., supra.*

Under all the circumstances we cannot say that the trial justice was clearly wrong in arriving at the above conclusions upon the evidence. Accordingly it is our opinion that it was not error for him to include in his decision an award for the damages suffered by the plaintiff as a natural and probable consequence of the defendant's wrongful action during the period from July 1, 1932 to September 19, 1933.

The second of these questions concerning damages relates to the allowance by the trial justice, as part of the damages, of interest at the rate of 6% per annum upon the computation of monthly "lost profits", as above referred to, which amounted basically to $1019.34. In this connection it should be noted that the plaintiff's declaration does not allege anywhere specifically any loss of interest at 6% on such monthly computations as one of the elements of its claim of damages. Neither does the correct measurements of damages by way of lost profits, as asserted by the plaintiff, and as supported by the authorities cited by it, include such interest as a matter of law. It appears to us to be more an expected profit upon a lost profit, which ordinarily is too remote and speculative and is not the natural and probable consequence of the defendant's wrongful act. Granting even that the recovery of such interest may be possible, if and when properly alleged and proved, the evidence here does not support such a claim by the kind of proof required to establish such damages, under the general principles and rules above enunciated and relied on by the plaintiff.

Moreover, the amount of electricity to be used by the plaintiff and its tenants, the gross amounts of its cost and of the deductions to be later allowed in the various computations, were not sufficiently known or liquidated at the time the interest was supposed to be charged, to warrant

the allowance of interest on such monthly net balances, as were later determined at the trial. *Princess Ring Co., Inc.* v. *Read,* 58 R. I. 178. It appears to be an attempt to obtain the benefit of the statutory rate of interest allowed upon a judgment or decision, and of course there was, at the time of its computation no judgment or decision to support this item of interest, as charged. Under all the circumstances presented in the instant case we are of the opinion that it was error to allow, as a portion of the damages, such interest at the rate of 6% per annum upon the computation of the monthly net balances, as figured by the plaintiff.

According to the figures in evidence above referred to, the basic amount of damages as found by the trial justice, after allowable deductions, was $12,300.49. This sum included $1019.34, representing interest on the monthly computations, which was erroneously charged. Therefore the basic finding of damages should be reduced by the latter amount to $11,281.15. To this last sum, however, the plaintiff is entitled to have added interest at the rate of 6% per annum from the date of the writ.

For the reasons stated the amount of the damages are excessive and the defendant's exception in this regard is sustained; all of its other exceptions are overruled.

The case is remitted to the superior court for a new trial, unless the plaintiff on or before the 18th day of August, 1937, shall file in the superior court a remittitur of all of said decision in excess of the amount to which it is entitled in accordance with our opinion. In case the plaintiff shall file such remittitur, the superior court is directed to enter judgment for the plaintiff on the decision, as modified by such remittitur.

Moss, J., dissenting. I am unable to agree with the majority of the court, either in their reasoning or in their conclusions. In my judgment it should be held that the doctrine of "primary jurisdiction" is in force in this state, with regard to the public utilities which are under the

control of the state "division of public utilities", as successor of the "public utilities commission."

It is true that in the case of *Texas & Pacific Ry. Co.* v. *Abilene Cotton Oil Co.*, 204 U. S. 426, in which this doctrine seems to have first been promulgated, a good deal of weight was given to the consideration, as phrased at page 440, that "if, without previous action by the Commission, power might be exerted by courts and juries generally to determine the reasonableness of an established rate, it would follow that unless all courts reached an identical conclusion a uniform standard of rates in the future would be impossible, as the standard would fluctuate and vary, dependent upon the divergent conclusions reached as to reasonableness by the various courts called upon to consider the subject as an original question." At page 441 the court draws the conclusion that the recognition of the right to bring a court action involving the determination of an established rate "is wholly inconsistent with the administrative power conferred upon the Commission and with the duty, which the statute casts upon that body, of seeing to it that the statutory requirement as to uniformity and equality of rates is observed"; and that it would destroy the prohibitions against preferences and discrimination.

Exactly the same consideration and conclusion apply to matters of regulations, practices and the like, as was held in the later cases in the Supreme Court of the United States which are cited in the opinion of the court in the instant case.

The above consideration does not apply with quite the same force with regard to the respective jurisdictions of state courts and state utility commissions, because the nation is so much larger than any state. But in my judgment it still applies with compelling force; and it seems clear to me that the same conclusion applies to the case of any public utility company operating under the regulation and control of a state public utility commission under an act similar to that in this state, which is closely modeled on

that creating the interstate commerce commission. The prime objects of such an act cannot be attained, with any degree of success, unless any question of the reasonableness, validity or conformity with public policy of any rate, regulation, service or practice of such utility company is determined solely by the commission, after hearing with notice to all concerned, and in a decision which is binding on everyone who may be affected by such rate, regulation, service or practice and which is subject to only one appeal to the judiciary.

All of the cases that I have been able to find in which this matter has been decided as to public utility companies operating under the regulation and control of such state commissions are in support of this conclusion and follow the doctrine of "primary jurisdiction" in conformity with the above decisions of the Supreme Court of the United States. Among these are *State ex rel. City of Billings* v. *Billings Gas Co.*, 55 Mont. 102, 173 P. 799 (1918); *Doney* v. *Northern Pacific Ry. Co.*, 60 Mont. 209, 199 P. 432; *Hewett Logging Co.* v. *Northern Pacific Ry. Co.*, 97 Wash. 597, 166 P. 1153 (1917); *Tacoma Eastern R. Co.* v. *Public Service Comm.* 117 Wash. 609, 202 P. 1 (1921); *St. Paul Book & Stationery Co.* v. *St. Paul Gas Light Co.*, 130 Minn. 71, 153 N. W. 262 (1915); and other cases cited in these cases.

The court in the *Doney* case, *supra,* discusses the subject most fully and clearly. There the action was brought by a shipper to recover damages for alleged discrimination and unreasonable freight charges collected by the defendant railroad company from the plaintiff on certain lumber shipments. The court says, at page 227, that the legislature, having by a statute provided for a board of railroad commissioners, "and prescribed its powers, duties and functions, in the fixing of reasonable freight rates and the prevention of discrimination by independent carriers as well as joint carriers, its provisions are, in our opinion, exclusive in so far as plaintiff's alleged rights involved are legislated upon, and the remedies thereby prescribed must be followed."

At page 235, the court says: "No cause of action can arise in favor of the shipper until the rate complained of has been modified, by the Railroad Commission upon proper application to it, or by it after judgment of a court of competent jurisdiction in a direct proceeding within the provisions of the statute, determining the rates as fixed by the board to be excessive or unreasonable. The shipper's remedy is to promptly have the rate modified, if unreasonable, by the commission, or to have the reasonableness thereof determined by a court in an action to review the reasonableness of the rates as fixed and established. . . . Plaintiff's remedy was to apply to the Railroad Commission for a modification of the rate established or *for the fixing of a rate in the event no rate had been established.*" (italics mine)

After discussing this matter under the Interstate Commerce Act and citing many federal cases, and calling attention to the fact that under the federal act the commission was expressly authorized to order the payment of reparation for any unjust rate or discrimination, the court says, at page 236: "The reasoning in the above cases applies with equal force to our statute and to the lack of jurisdiction of the courts to pass upon the reasonableness of the rates and discriminations before the commission has taken action thereon. In other words, before any shipper can recover in the courts damages for excess rates or discriminations, the discriminations or unreasonableness of the rate must first be passed upon by the special tribunal expressly created and authorized by law to handle such matters—the Railroad Commission.

"The fact that the Railroad Commission is not authorized, upon determining that a rate is unreasonable or discriminatory, to order reparation, does not prevent a shipper, after the rate has been so determined by the special tribunal created for that express purpose, from maintaining an action in court to recover damages sustained by him as a result of such unreasonable or discriminatory rate. His action

is based upon the fact that such rate has been so declared by the proper tribunal, and the court merely determines the amount of damages, if any, sustained." Were this not the correct procedure under the statute, great and inevitable confusion and uncertainty would result, as there might arise a multiplicity of suits with varied determinations in the several jurisdictions of the state.

In accordance with the view of the Montana court, I am convinced that the fact that the I. C. A. gave the interstate commerce commission, as well as the courts, the power to award reparations to a person damaged by a violation of the act by the carrier, while our public utilities act gave the public utilities commission no such power, is no reason for holding that the doctrine of "primary jurisdiction" does not apply under the public utilities act of this state.

It is worthy of comment that the trial justice in the instant case, in denying in his written decision the defendant's motion to dismiss, which was based on the ground of want of jurisdiction in the court under this doctrine, did not say or even intimate that the doctrine was not applicable to proceedings under our statute, but denied the motion solely on the ground that the case fell within a rule established by the decision of the United States Supreme Court "that if the rule, regulation or practice of the utility is not attacked but the claim of the plaintiff is based on the violation of the utility's own practice or rule, then prior application to the administrative tribunal (interstate commerce commission) is not required."

I agree that on this ground he was justified in denying a similar motion, when made at the trial before any evidence was submitted, and when renewed at the close of the plaintiff's evidence, because it was not then clear whether or not the decision of the case would require a ruling on the nature or validity of the rule, regulation or practice involved in the case. What in my opinion was the proper application of the doctrine in the decision of the case, when all the evidence was in, will appear later in this opinion.

The point made now is that in my opinion the doctrine, within the limits defined in the cases on the subject in the United States Supreme Court, should be held to apply to proceedings brought against public utility companies to recover damages for violations of the provisions of our public utilities act.

The plaintiff's principal and almost sole contention upon which it rests its right to recover is that *it had a right under the defendant's established practice,* to enjoy the privilege of having a master meter and of submetering, by which it could make a profit by buying electricity at the defendant's low large-quantity rate and reselling it to its tenants at higher rates; that it was damaged by the wrongful denial to it of that privilege and not by wrongful allowing of that privilege to other customers of the defendant; and that therefore the proper measure of its recoverable damages is the profits which it would have made by thus buying and selling electricity, if this privilege had been granted to it by the defendant.

After a careful consideration of the written decision of the trial justice, I am convinced that he rested his decision for the plaintiff squarely on the above grounds, contended for by it; and that he found the defendant's refusal to grant submetering privileges to the plaintiff, to be wrongful because against the established practice of the defendant to grant such privileges to customers in a similar situation to that of the plaintiff. In my opinion the decision must stand or fall according to whether that finding was correct or not; and in my opinion it was not correct.

The Rhode Island public utilities statute does not require the filing with the commission by any public utility company of any statement of its regulations or practices with reference to the service rendered by it, though it may file such statement. According to the cases and other authorities, as I understand them, the result of this state of the law is that the regulations and practices actually adopted by such a company and regularly applied are the standard

regulations and practices for that company, in the absence of any contrary ruling by the commission; and that anyone in interest who is not satisfied with that standard can file a complaint thereof with the commission or any tribunal which has succeeded to its functions under the act. The Rhode Island statute specifically provides for the filing of such a complaint and for a hearing and decision thereon by the commission. A vital question in the instant case, then, is what was the standard practice of the defendant with regard to submetering at the time when the plaintiff's request for the privilege of submetering was refused.

In my opinion the principles governing, in a situation such as that in the present case, are best set forth in an opinion by *Cardozo, J.*, in *Postal Telegraph-Cable Co.* v. *Associated Press,* 228 N. Y. 370. There the question was one of rates and not of practices or service, but the principles involved are the same. In that case the utility company was not required by the I. C. A. to file its rates with the commission, and, without filing, it had adopted a new and reduced schedule of rates for private-wire service. It had given the benefit of the new rates to all other customers having private-wire service, but had denied such benefit to the defendant, because there was an unexpired contract between them for the old rates, which the court held was no justification for the discrimination. The action was one for recovery of charges, at the old rates, for service rendered after the adoption of the new schedule; and the court held that the plaintiff was entitled to recover only at the new rates.

At page 379 the court says that the defendant is not suing to recover charges for a tort, under sec. 8 of the I. C. A., which is almost identical with the section under which the instant case was brought. It then continues: "It is defending against an attempt to charge it with something in excess of the established rates. What it resists is not merely a discrimination, but an overcharge. Every overcharge, when exacted of one to the exclusion of others, is, indeed, a dis-

crimination. Not every discrimination is an overcharge. This case does not require us to hold that a customer, sued for the established and prevailing rate, may cut the payment down by proof, without more, that some favored individual, by force of illicit rebates, has obtained services for less. Whether the remedy is then in tort for the recovery of damages, which may be more than the rebate or less, and often merely nominal" (citing cases) "is a question not now before us. .... *There is a wide difference between claiming the benefit of a privilege conferred upon a few to the prejudice of the many, and resisting exclusion from privilege conferred upon the many, and denied only to a few.* In one case, the customer is aggrieved because someone else is paying too little. In the other he is aggrieved because he must pay too much himself. An overcharge results when the rate exacted is unreasonable. .... I think an overcharge also results when the rate exacted of the individual is in excess of the rate in force between the company and the public, for the public includes the individual as a component of the mass . . . ." (italics mine)

Just a little further on, the court, reasoning from the analogy with railroad rate cases, says: "The only legal rates for them are those on file with the commission. Discrimination in favor of one shipper does not pull down the rate for others who have conformed to the established tariff. It gives a right of action for damages which may be nominal or substantial (*Penn. R. R. Co.* v. *Int. Coal M. Co., supra*). Payments in excess of the established tariff stand, however, on a different basis. These the shipper may recover to the extent of the excess, 'not as damages, but as overcharge' (*Penn. R. R. Co.* v. *Int. Coal M. Co., supra,* at p. 202). The analogy, extended to this case, gives a right of resistance to the customer who is wronged by a departure from the norm. A tariff may be an established one for telegraph companies as for railroads (*Kansas City So. Ry.* v. *Albers Com. Co.,* 223 U. S. 573, 574). Its marks may be less definite and obvious. To identify it may be harder. None the less, while it exists,

there is a like duty to adhere to it within the limits of equality and justice. I think there is evidence justifying a finding that the plaintiff established a new tariff in September, 1915, as effectually as if it had put the changes in writing and filed them in a public office."

These are long quotations, but they seem to be justified by their importance in the present case. I am convinced that the principles there laid down are correct; and that when they are applied to the facts proved by the evidence in this case, the only reasonable conclusion is that the trial justice clearly erred in ruling, not expressly, perhaps, but at least by unavoidable implication, that at the time when the plaintiff's requests for submetering privileges were denied, the established practice of the defendant was to grant such privileges to customers in substantially the same situation as the plaintiff.

That he did so find is clear from the facts that in the part of his written decision in which he denied the defendant's motion to dismiss the case for want of jurisdiction, he said, as quoted, *supra,* that a rule of jurisdiction established by decisions in the United States Supreme Court "is that if the rule, regulation or practice of the utility is not attacked but the claim of the plaintiff is based on the violation of the utility's own practice or rule, then prior application to the administrative tribunal (Interstate Commerce Commission) is not required; that he next quoted the following from *Baltimore & Ohio R. Co. v. Brady,* 288 U. S. 448 at 457: "In such cases the court is required merely to decide whether the carrier has departed from its established standard"; that he then said: "In the opinion of the court this is the character of the case presented at bar, both by the pleadings and upon the evidence"; and that he rendered a decision for the plaintiff which was obviously based on its own theory of its case.

Within the territory for which the defendant was the only utility company supplying electricity, there were very many large buildings in each of which were many tenants using,

respectively, considerable amounts of electricity produced and sold by the defendant. Many of the owners of these buildings (and I include in the word "owner" the lessee of an entire building) were in substantially the same situation as the plaintiff was in at the time when it applied to the defendant for the privilege of buying and selling electricity by what may be called a "submetering service."

The plaintiff's request was refused on the grounds that such a service was against the defendant's policy and regulations; that public policy directed its refusal; and that in most cities submetering was not allowed or was being withdrawn. The defendant now contends that these were valid grounds. The plaintiff contends that on the contrary such service was in accordance with the defendant's then established practice and that whether it was contrary to public policy had not then been determined and was not material.

As to the former point, the evidence showed clearly that among the very many owners of buildings with numerous tenants that were considerable users of electricity produced by the defendant, there were only *four* that at the time of the plaintiff's application, or during any part of the last preceding five years, were permitted to have such a submetering service or anything like it. The defendant contends that these four cases were all exceptional, in that each of them had a special feature or features, which justified the special treatment which was given to it, and made it not a *violation* of the defendant's standard practice against submetering but an *exception* to it.

The earliest of these cases was that of the Royal Realty Company. As to that, the only special features shown by the defendant, in comparison with the plaintiff's situation, were that in the former case the owner itself was a large user of the defendant's electricity and that it had only a few tenants, which used only comparatively small quantities of electricity, whereas the plaintiff used little electricity and its thirty tenants used large quantities. It seems to me that the two cases differ in degree only, and that the contract

between the Royal Realty Company and the plaintiff, which was made in 1926 and was still in force when the plaintiff's first application was made, was not in accordance with what the defendant contends was its settled practice in 1931.

Two others of the four cases mentioned were those of Trades Building Inc., and Arnold Realty Company. In each of these the owner of the building had water power from which it was deriving a large, but variable and unreliable part, of the electricity needed by its tenants; and they needed more. This presented a somewhat difficult problem, which was solved in the former case by the defendant furnishing to the owner, at the quantity rate, electricity as required, for mixture and distribution with the owner's own electricity. It was solved in the latter case, where the owner's generators produced only direct current electricity and the defendant's electricity was only alternating current, by having the defendant supply to the owner alternating current, for use, in the owner's dynamo, to produce mechanical power, which in turn was used by the owner, together with its own water power, to produce direct current electricity.

The latter case was held by the trial justice to be not within the purview of the instant case. The former one he held to be inconsistent with the defendant's contention as to what was its standard of service in 1931 and later. I am inclined to think that neither one was fully consistent with that standard, but the question is a very close one and in my judgment the situations in those cases were so far difficult and exceptional that they cannot properly be given any appreciable weight in determining what was in 1931 or later the defendant's *regular standard* of service. In the fourth of the cases above mentioned the defendant furnished electricity to one tenant in a building, for use by it and another tenant, the two being understood by the defendant to be under joint control. This case also was excluded by the trial justice as not within the purview of the instant

case and I cannot see that it can properly be given any weight in the determination of the above question.

On the other hand, in the fall of 1926, the defendant refused a request by Manville-Jenckes Corporation for the privilege of having a master meter and submeters in a large building which it proposed to rent to various tenants. A witness, who had had full charge of such matters for the defendant, testified, without any contradiction—and the trial justice in his decision expressed no doubt of his veracity —that in the summer of 1930 the defendant, which for some years, he said, had avoided submetering, where it seemed practical to do so, definitely adopted a firm policy against it and decided that the very few existing contracts of that general nature should be terminated as soon as practicable.

The testimony proves that no new special privilege that was understood by the defendant to be a submetering privilege was granted or permitted after that time, and that, on the contrary, a request for such a service was denied in March 1931 to General Electric Realty Corporation, which was able to supply a part of the electricity needed by its tenants, but was otherwise in substantially the same position as the plaintiff, and a similar request from the owner of the Gallagher Building was denied in October 1931 and one from Special Realty Corporation a few months later. The testimony also proved that in August 1931, in accordance with the power to do so reserved in its contract with Royal Realty Company, the defendant gave notice of the termination of that contract at the earliest date then possible.

Except for a special arrangement which it made with Special Realty Corporation, the only conduct by the defendant, after its definite adoption in the summer of 1930 of a firm policy against submetering, that may be contended to be inconsistent with that policy, was that it did not give the Royal Realty Company an earlier notice, by September 1 of that year; and that, by reason of business difficulties in the way, it did not terminate its contract with Trades

Building, Inc. until November 1, 1933, by a notice, which had to be given at least one year before that date; and submetering by that customer was not actually stopped until the end of 1934. These instances of delay have practically no tendency to show that the defendant's settled policy and regular practice were not against submetering, though the plaintiff may have had a right to complain of such delays and to recover damages, if they caused it any.

As to Special Realty Corporation, the defendant, after having definitely refused it a submetering service, entered into an experimental "arrangement" with that building owner for a special form of service, for a few of its tenants, which is known as that of "electrically serviced space." That such a special form of service may be perfectly proper and not inconsistent with an established practice against submetering is clearly shown in *Sixty-Seven South Munn, Inc.* v. *Public Utilities Commissioners,* 106 N. J. L. 45, 147 A. 735 (1930), affirmed, on the opinion below, in 107 N. J. L. 386, 152 A. 920 (1930), *certiorari* denied 283 U. S. 828, 51 S. Ct. 352, evidently the case referred to in the letter from the defendant's president to the plaintiff denying the latter's first request for submetering service.

I am inclined to agree with the conclusion of the trial justice in the instant case, that what the customer was permitted by the defendant to do, with some assistance from the defendant, after that "arrangement" was entered into, went beyond the proper limits of the doctrine of "electrically serviced space." But as soon as the defendant realized this, it put an end to the arrangement; and I cannot see that that whole affair was at all inconsistent with good faith on the part of the defendant in trying to apply consistently its settled policy and practice against submetering during the whole period for which the plaintiff is seeking to recover damages.

I find the rule to be well settled, and supported by sound principal and authority, that a few departures from an adopted and otherwise universally applied standard of

service does not destroy that standard, or make it less binding on the public utility company or its customers. This rule is set forth in some of the language of *Cardozo, J.,* above quoted.

As set forth in an earlier part of this opinion and for the reasons there given I am convinced that the decision of the trial justice in the instant case is based, not expressly but none the less clearly, on a finding by him that during the period for which the plaintiff is claiming damages the defendant's standard of practice was in favor of submetering of electricity and resale by its customers. In my judgment, that finding was clearly against the great weight of the evidence, which showed conclusively that during that period the standard practice of the defendant was just to the contrary, though, in my opinion, it was not quite universally and strictly applied.

As I have tried to show near the beginning of this opinion, this standard practice of the defendant utility company must control this case, unless shown to be a wrong practice. Under the doctrine of "primary jurisdiction", which I believe should be held to be in force under our public utilities statute, this practice could have been shown to be wrong in only one way, *viz.,* by proceedings taken before the public utilities commission, subject to an appeal to this court. But the plaintiff did not then institute such proceedings.

Later the defendant filed, with the commission, regulations which incorporated this practice, thus making it public, but not, in my opinion, making it any more binding, except that probably it could not be changed thereafter except by filing the change with the commission. Then the plaintiff instituted proceedings before the commission, attacking the validity of the regulations, but soon abandoned these proceedings, because, as shown by evidence in the instant case, its counsel did not believe that they would be successful.

If the doctrine of "primary jurisdiction" does not apply as to the Rhode Island public utility commission, the plain-

tiff could in this case have attacked the reasonableness of the defendant's policy and regulations, on which, by the letter of its president, its denial of the plaintiff's first request was based, and which, he said, the defendant felt was directed by public policy. The plaintiff did not then or ever raise that question; and it is clear to me, on principle and from what appears to be an unbroken chain of authority, that the defendant was right, and that the plaintiff is now recovering damages because the defendant refused, on the ground of public policy, to grant to it privileges, the granting of which would have been in violation of public policy.

For cases involving submetering see *Sixty-Seven South Munn, Inc.* v. *Public Utility Commissioners, supra; Lewis* v. *Potomac Electric Power Co.,* 64 Fed. (2d) 701 (1933); *Florida Power & Light Co.* v. *State ex rel. Malcolm,* 107 Fla. 317, 144 So. 657 (1932); *Karrick* v. *Potomac Electric Power Co.,* P. U. R. 1932 C, 40. A question which seems to me to depend upon exactly the same principles has arisen with regard to telephone service and, so far as I have been able to ascertain, has uniformly been decided in the same way as in the above cases, *viz.,* that it is wrong for any telephone company, subject, as is the defendant, to regulation by an administrative authority under a public utilities statute, to furnish telephone service wholesale to a customer with permission to retail that service to others, without regulation by such authority and for the benefit of such customer. *Hotel Sherman Co.* v. *Chicago Telephone Co.,* P. U. R. 1915, F, 776 (Ill.); *Re Hotel Tel. Service & Rates,* P. U. R. 1919 A 190 (Mass.); *Connolly* v. *Burleson,* P. U. R. 1920 C, 243 (N. Y.); *Re Hotel Marion Co.,* P. U. R. 1920, D, 466 (Ark.); *Hotel Pfister* v. *Wisconsin Telephone Co.,* 203 Wis. 20, 233 N. W. 617 (1930).

In the last of these cases the court said: "If such practice were permitted, it would open the door to discrimination, and thereby afford a means of evading one of the most important provisions of the statute and render it impotent to accomplish the purpose of its enactment." This is precisely

the ground upon which a submetering service by an electric company, which is under regulation by a commission, has always been held, and should be held, to be illegal; and exceptions should be made only in cases adjudged by the commission to be so exceptional that this ground does not apply.

For the reasons above set forth, it is clear to my mind that the plaintiff in the instant case had no right whatever to recover any damages on the ground that a submetering privilege was wrongfully refused to it by the defendant; and that the only right it could have would be to recover any damages caused to it by wrongful discrimination against it by the defendant, in permitting submetering by any of its other customers in like situation with the plaintiff. But, granting that such wrongful discrimination was proved, the plaintiff failed to prove that it suffered any damages therefrom.

The plaintiff, rather half-heartedly it seems to me, contends that even for such discrimination, consisting solely of the wrongful granting of favors to other customers, which were not granted to it, it has the right to recover profits which it would have made if similar wrongful favors had been granted to it. But that contention is in my judgment against sound principle and against the decisions in all or almost all the cases based on statutes like the I. C. A. and our own.

Under the I. C. A. the law is perfectly well settled against such a contention, both as to discriminations in rates and as to discriminations in facilities or service; and the Rhode Island statute on public utilities is in all relevant respects the same as that statute, except for immaterial differences in phraseology. The leading case is *Pennsylvania R. Co.* v. *International Coal Mining Co.*, 230 U. S. 184, cited in the majority opinion in the instant case. There *Pitney, J.* alone dissented, and his dissent was based partly on rate cases at common law, where there were no standards below which rates were unreasonably low, and the only question was

whether the rate that a plaintiff had to pay was unreasonably high.

But his dissent seems to me to have been based mainly on certain English railroad rate cases, which were decided under the "equality clause" of certain statutes under which, likewise, there were apparently no standards below which rates must not fall. The reasoning of the courts in those cases was that the very fact that another shipper was charged for a certain transportation service a certain rate, which was lower than the plaintiff was charged by the same railroad for a like service, was evidence enough that the former rate was the reasonable rate and that the plaintiff's rate was therefore too high by the amount of the difference between these rates, which amount the plaintiff was therefore entitled to recover from the railroad as an overcharge, in an action of assumpsit for money paid. Those cases were not in tort, as the instant case is, and must be, under our statute.

No such reasoning can apply in cases under public utility statutes, where standards of service, as well as of rates, are all important, and administrative tribunals are provided to determine, if questions arise, what are proper standards, and to do so in decisions which will be binding on all persons in any way concerned. In cases under such statutes, even omitting the federal cases, the weight of authority, as well as sound principle, is strongly in favor of the rule that a plaintiff, in an action for damages against a public utility company, because a certain kind of service was granted to some other customer or customers in like situation with himself and denied to him, cannot recover for the added profits that he would have made if he had received such service, unless he can prove that he was entitled to such service *as standard service* of the company, and that the fact that some such other customers were getting such service by no means proves that it was standard service.

The plaintiff here cites only four authorities as being against this rule. The earliest is *Sullivan* v. *Minneapolis &c.*.

*Ry. Co.,* 121 Minn. 488, 142 N. W. 3 (1913). This was brought as a common law action to recover the excess of the amount of freight charges which the plaintiff had been obliged to pay to the defendant above the amount which it had charged another customer for similar shipments between the same points, the carriage being wholly intrastate. There was a regulatory statute, but the court found that it contained no provision for the recovery of damages by a shipper discriminated against and left that to be remedied at common law. The court applied what it said was the common law rule, that the measure of recovery was the difference in the rates, and said that any other conclusion would be inconsistent with the construction of sec. 8 of the I. C. A. by the decision of the United States Circuit Court of Appeals in the *International Coal Mining Company* case, which was very soon afterwards reversed by the Supreme Court, *supra.*

The next case cited by the present plaintiff is *Seaman* v. *Minneapolis &c. Ry. Co.,* 127 Minn. 180, 149 N. W. 134 (1914), with which was heard and decided a later phase of the above *Sullivan* case, the two cases involving the same point. The court adhered to the above rulings as to damages, in spite of the intervening decision of the United States Supreme Court in the *International Coal Mining Company* case. It admitted that in the former opinion in the *Sullivan* case, it had overlooked the fact that a remedy by a shipper discriminated against was expressly provided in the state statute, but said that it also contained a provision saving common law remedies.

The next case cited is *Mitchell Coal Co.* v. *Pennsylvania R. Co.,* 241 Pa. 536, 88 A. 743 (1913). There the headnotes say that the fact that the plaintiff had notice that rebates were being given to certain competitors and denied to it did not preclude it from recovering damages "measured by the rebates allowed its competitors"; but I can find in the opinion no discussion of the question of the proper measure of damages in such cases. There is simply a statement that the effect of the rebate was to cause damage to the

plaintiff to the extent of the rebate. Whether this is meant as a statement of law or of fact does not appear.

The latest case cited is *National Radiator Co.* v. *Pennsylvania R. Co.*, 6 N. J. Misc. 778, 143 A. 85 (1928). This was merely a decision in a circuit court of New Jersey, which held, in a case brought for violation of an equality clause in a state statute, that the measure of damages was the difference in rates. At page 88, the court, evidently referring to I. C. A's sec. 8, which is so closely parallel to the section under which the instant case is brought, said: "Unlike the acts of Congress, which declare the measure of damages recoverable, our statutes merely prohibit the giving of preferences. The recovery must be in accord with the common law."

The court admitted a conflict as to the measure of damages, actual loss being the measure according to one line of decisions. It would not follow the federal rule because, it said, that rule was based "upon the peculiar terms of the act of Congress." It cited three cases in support of its decision. The first was a case arising under a Colorado statute, the relevant provisions of which do not appear, and the question is not discussed. Another of these cases was the *Sullivan* case, above discussed. The third was *Cook* v. *Chicago &c. Ry. Co.*, 81 Ia. 551, 46 N. W. 1080, which was an action at common law and based on a finding that the lower net rate charged another shipper in a like situation was the reasonable rate and that the rate charged the plaintiff was unreasonable to the extent of the difference between the two rates. All these cases seem to me of no real weight in favor of the plaintiff's contention in this case.

On the other side of the question there are many cases in the state courts, of which the following are fair examples, together with the cases cited therein. *Boerth* v. *Detroit City Gas Co.*, 152 Mich. 654, 116 N. W. 628, 18 L. R. A. (N. S.) 1197 (1908); *Lilly Co.* v. *Northern Pacific R. Co.*, 64 Wash. 589, 117 P. 401 (1911); *Frank A. Graham Ice Co.* v. *Chicago &c. Ry. Co.*, 153 Wis. 145, 140 N. W. 1097 (1913);

*Toledo &c. Ry. Co.* v. *Wren,* 78 Ohio St. 137, 84 N. E. 785 (1928).

According to the authorities and on sound principle, I am convinced that the plaintiff in the instant case cannot rightly recover by reason of any submetering privileges which the defendant wrongfully permitted any of its other customers to enjoy, unless the plaintiff can prove that it suffered actual damage, in competition with such other customers, by reason of such privileges permitted to them; and that, as it did not prove any such damage, it failed to prove any right of action on that secondary theory of its case, just as it failed to prove any right of action on its primary theory of its case.

In my opinion the result of the decision of the superior court, as affirmed by this court, is that the defendant is being obliged to pay to the plaintiff very heavy damages, not at all because it had wrongly permitted a very few of its other customers to continue too long to enjoy submetering privileges, which were contrary to public policy, but solely because it rightly refused the plaintiff's demands that it go farther on the wrong course than it had ever gone before and grant a new and greater submetering privilege, after it had been rightly advised that submetering was contrary to public policy and had definitely adopted a firm policy against such privileges. I cannot concur in such a result.

In my opinion the defendant's exception to the decision of the superior court for the plaintiff should be sustained; the decision should be reversed and an opportunity should be given to the plaintiff to show cause why the case should not be remitted to the superior court with a direction to enter a judgment for the defendant.

*Hinckley, Allen, Tillinghast & Wheeler, Harold A. Andrews, Noel M. Field,* for plaintiff.

*Edwards & Angell, Edward Winsor, Wm. H. Edwards* for defendant.